.Casey, C. J.,
delivered the opinion of the Court.
Some time in the year 1S14, and during the war between the United States and Great Britain, a large British fleet entered the Penobscot river, took possession of the town of Castine, and held it for some time. While this fleet lay at Castine, a sloop, which was a tender to one of the enemy’s men-of-war, together with a launch, was sent up *175 the river, under the command of Lieutenant Simons, of the British ■navy. He landed at the town of Frankfort, demanded the arms of the militia of the place, and a lot of cocoa, which was secreted some distance from the town. The arms, to the number of about one hundred, were delivered up to him, and placed on board the sloop. The authorities of the town, to prevent further depredations upon the citizens and their property, employed teams and had the cocoa brought into town, and there delivered to the British officer upon the wharf. There is some discrepancy in the testimony as to what amount of the cocoa had been placed on board the sloop. The weight of the evidence shows that a portion of it was on board. The balance remained on the wharf. At this juncture the claimant, who was a lieutenant in the 40th regiment United States troops, commanded by Colonel John Loring, with a detachment of from twenty to thirty men, entered the town, took the British officer and his crew prisoners, sent them off to Portland as such, and delivered them to the general commanding at that post. The sloop and launch, with a portion of the cocoa, and aboirt one hundred muskets found on board, were burned and totally destroyed, except about thirty of the muskets, which Lieutenant Morse retained for the use of his own men.
The claimant brings this suit on behalf of himself and his men, or their heirs, who served under him at that time, to recover the bounty allowed by the act of 3d March, 1813, (2 Stat., 816,) for the destruction of any armed vessel of the enemy. He also claims the bounty allowed by the act of 19th March, 1814, (3 Stat., 105,) allowing to certain persons a bounty of one hundred dollars for every prisoner captured and delivered to any agent of the United States in any port, &c.
The United States resist a recovery in this case on the grounds—
1st. That the vessel destroyed was not an armed vessel within the purview of the act of 1813.
2d. That there was no actual cargo on board for which any allowance can be made.
3d. That the bounty for prisoners was confined to those captured and delivered under the act of 1814 to the owners, officers, and crews-of the commissioned privateers of the United States.
4th. The statute of limitations.
1. The act of 3d March, 1813, under which the plaintiffs claim for the vessel and cargo is, is as follows :
“ That during the present war with Great Britain, it shall be lawful *176 for any person or persons to burn, sink, or destroy any British armed vessel-of-war, except vessels coming as cartels or flags of truce ; and for that purpose to use torpedoes, submarine instruments, or any other destructive machine whatever; and a bounty of one-half the armed vessel so burnt, sunk, or destroyed, also one-half the value of her guns, cargo, tackle, and apparel, shall be paid out of the treasury of the United States to such person or persons who shall effect the same, otherwise than by the armed or commissioned vessels of the United States.”
To constitute a “ British armed vessel-of-war” under this act, it was not necessary that she should have any particular or specified armament. If she belonged to the British navy, and was used for hostile purposes, being armed with muskets, pikes, cutlasses, &c., it was enough to bring her within the intention of the act.
That she bore this character the evidence does not leave in doubt. She was detached from a fleet of nineteen or twenty armed vessels which lay below in the river at Castine. The barge or launch that accompanied her approached the wharf, armed with cutlasses and blunderbusses, while the sloop lay out in the river, having at least a number of -muskets on board. She was in command of officers and seamen of the British navy — a lieutenant, quartermaster, midshipman, and eleven seamen. She was sent on a hostile mission, and was engaged in executing it when her crew was captured and the sloop and her barge destroyed. We cannot doubt that she comes directly within the description contained in the act. Nor is she entitled to the benefit of the exception of a vessel coming “as á cartel or flag of truce.” It is true this sloop and launch came to Frankfort flying a flag of truce. But it is also true that her mission and purpose was a hostile one, and that she was engaged in carrying out that hostile purpose at the very moment when she was seized by Lieutenant Morse and his men. This was perfectly well understood by Morse, that the flag of truce could not protect the British officer while he plundered a town. He acted on that principle, and he acted properly, and the United States authorities sustained him in so doing by refusing to give up the prisoners he had captured.
2. The evidence, or at least the weight of the evidence, shows that a portion of the cocoa was on board the sloop when she was captured.
Walter Robbins’s, Record, on folios 21 and 23; Benjamin Thompson, folio 42 ; Stephen Kempton, folio 50 ; and James B. Chick, folio 65, all agree that a part of the cocoa had been placed on board the sloop. *177 The last witness says “ the hold of the sloop was nearly or quite full with the 'cocoa.” And we think for' such part as was on board the claimants should recover. The act was passed to encourage the destruction of the armed vessels of the enemy entering our inland waters, by stimulating the exertions of private persons, as well as soldiers or sailors, to engage in adventures for that purpose. It had relation to •the public defence and safety in. a time of war, and is to receive a liberal and beneficial interpretation in accordance with the purpose and spirit of the enactment. It was a bounty offered for meritorious and hazardous public services, and we are not to apply its words or construe its provisions in a close, cramped, technical spirit, so as to exclude any who came fairly within its purview.
Such we believe to be the liberal and enlarged construction given by our courts and all the departments of the government to this class of enactments. And Congress has, with great magnanimity, in numerous cases where persons have been excluded by the terms of the ■acts, supplied the deficiency by a special law.
Regarding the case in this light, we think the claimants justly en-. titled to the bounty for the sloop and launch, and also for one hundred muskets found on board, and for one-half the cocoa, being twelve and a half tons. The evidence makes the quantity of cocoa in the whole brought in between twenty and thirty tons, Some of the witnesses speak of it as low as twenty and others as high as forty tons. Those who had the best means of judging appear to estimate it as we have stated.
It has, however, been insisted that Lieutenant Morse and his men having been soldiers in the service of the country, it was a part of their duty to capture these prisoners and to destroy this enemy’s property, and therefore the act does not embrace them. It is a part of the duty of our navy to capture or destroy the enemy’s ships whenever or wherever they can; and yet not only our own government, but most if not all the civilized governments of the woiid, allow the captors to share in the prize to a greater or less extent, as measured by the merit and hazard of the service. It has been deemed good policy in this manner to unite the interest and duty of the navy; and it is sometimes good policy to stimulate the. patriotism and loyalty of public servants even by an appeal to their cupidity. But this act declares that any person or persons who shall render the service shall be entitled to the reward. Whether they are private individuals, soldiers, sailors, or whosoever they may be that destroy the vessel, they are entitled to the bounty.
Mr. O, Ingle for claimants.
Mr. Weed, Assistant Solicitor, for the government.
3. The claim of fourteen hundred dollars made for the capture of' the British lieutenant, quartermaster, midshipman, and eleven other seamen, and their delivery to General Chandler at Portland, cannot be allowed. That bounty is given by the act of 19th March, 1814, (3 Stat, 105,) and by its terms is limited to the “ owners, officers, and crews of the private armed vessels of the United States commissioned as letters of marque.” This act is special and restricted in its character, and was evidently passed to encourage privateering. It is true Congress has, in many instances cited in the brief of the claimants, allowed the same bounty to others for similar services. But Congress has a right to do this. They judge of and dispense the bounty of the nation. Courts administer the law as they find it, following the • intentions of the legislature as near as they can gather them from the words and spirit of the enactments; and whatever claim a suitor may present to the consideration and magnanimity of the nation, yet, in order to justify us in rendering a judgment in his favor, his claim must be such as, between individuals, could be enforced at law or in equity.
4. A plea of the statute of limitations is also filed in the case. We have already decided in the case of Cadwallader Wallace’s Executor v. The United States, at the present term, that the limitation clauses contained in the 10th section of the act of 3d March, 1863, do not apply to or operate upon a claim a suit for which was pending in this court at the time of the passage of this act. That is the condition of this case; and we therefore hold that it is not barred by the provisions referred to.
We have estimated as follows :
The sloop at............................ $2, 400
The launch at........................... 250
100 muskets, at $8...................... 800
12j tofts cocoa, at 22 cts. (25,000 lbs.)...... 5, 500
One-half to claimants,...................2) 8, 950
#4, 475
We therefore find in favor of claimants the sum of'four thousand four hundred and seventy-five dollars.
Loring, J., dissented.
Hughes J., and Peck J., did not sit in this case.