## CRAIN et al. v. UNITED STATES.
### Nos. 45779, 45997.

United States Court of Claims.
July 11, 1949.

JONES, Chief Judge, and WHITAKER, J., dissenting in part.

———◆———

See also 62 F.Supp. 869, 104 Ct.Cl. 756.

Scott P. Crampton, Washington, D. C. (Geo. E. H. Goodner, Washington, D. C., on the brief), for plaintiffs.

Donald B. MacGuineas, Washington, D. C., H. G. Morison, Asst. Atty. Gen., for the defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

LITTLETON, Judge.

The plaintiffs are, and for many years have been, the owners of a large plantation of more than 51,000 acres in Mississippi County, Arkansas. Approximately 45,000 acres were in cultivation. Cotton was the principal crop raised on this land. In addition, corn, alfalfa, and other crops were grown. During the period 1933 to 1938, inclusive, the crops on the plantation were cultivated and grown by approximately 2,000 tenants, share croppers and day laborers.

During the years 1933 to 1935, inclusive, plaintiffs participated in the agricultural programs under the Agricultural Adjustment Act of May 12, 1933, 48 Stat. 31, 7 U. S.C.A. § 601 et seq., and regulations promulgated by the Secretary of Agriculture. For each year plaintiffs filed an offer to enter into a cotton benefit contract which, upon approval by the Secretary of Agriculture became a bilateral contract under the terms of the statute and the regulations. Under these contracts plaintiffs received for themselves and their tenants and share croppers payments in each of these years, which totaled more than $200,000.

The Act of May 12, 1933, supra, was declared unconstitutional on January 6, 1936, in United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914. By a supplemental Appropriation Act for the fiscal year 1936, approved February 11, 1936, 49 Stat. 1109, Congress appropriated funds to be used by the Secretary of Agriculture for the purpose of completing payments determined by him to be due for performance of contracts previously made.

Following the invalidation of the Act of May 12, 1933, Congress enacted the Soil Conservation and Domestic Allotment Act, approved February 29, 1936, 49 Stat. 1148, 16 U.S.C.A. §§ 590g–590q, providing in section 7 for grants to States and in section 8 for cash payments or grants of other aid, for a limited time, under regulations to be prescribed by the Secretary of Agriculture, to agricultural producers who complied with the provisions of the Act and the regulations issued thereunder, by engaging in the specified soil-rebuilding and soil-conserving practices. Appropriations were made for the purpose of carrying out the provisions of this Act and for the making of the payments therein authorized and provided for.

Contracts such as had been provided for and made under the invalidated Agricultural Adjustment Act were prohibited. The payments which were specified and authorized to be made by the Act of February 29, 1936, supra, were in the nature of a bounty or reward in return for performances of certain agricultural programs to be outlined by the Secretary of Agriculture, and they were expressly conditioned "upon the utilization of the land, with respect to which such payment is made, in conformity with farming practices which the Secretary finds tend to effectuate the purposes" of the statute. The Act of February 29, 1936, was amended by the Act of February 16, 1938, 52 Stat. 31, known as the "Agricultural Adjustment Act of 1938," and a number of additional provisions were enacted.

For the years 1936, 1937, and 1938, plaintiffs prepared and filed "work sheets" for the purpose of entering into the agricultural programs under the Soil Conservation and Domestic Allotment Act, as amended, and the regulations of the Department of Agriculture issued and promulgated thereunder (see findings 63 to 93). Plaintiffs received payments for 1936, but before any payments were made for 1937 and 1938 the Secretary of Agriculture had detailed and thorough investigations made of plaintiffs' operations and practices during the years 1933 to 1938, inclusive. These investigations were begun in 1939 and continued until sometime in 1941.

As a result of these investigations and the facts disclosed thereby, the Secretary decided in 1941, as set forth in detail in our findings of fact, that there were due from plaintiffs certain amounts as a result of overpayments determined by him to have been made under the agricultural programs during the years 1933 to 1936, inclusive (findings 11 to 83); that no amount was due plaintiffs for 1937 (findings 84 to 93); that plaintiffs had complied with

the agricultural program for 1938, as provided in the statute and regulations, and had earned and become entitled to receive payments for such compliance in the total amount of $77,386.13 (finding 9). The Secretary withheld from this amount the sum of $74,413.12 which he applied as an offset against the claimed overpayments for 1933–1936, and paid plaintiffs the balance of $2,973.01. Of this amount the sum of $385.57 had been. previously paid. The last check for $2,587.44 for the balance due for 1938, after the making of the offsets, was issued December 4, 1941. Plaintiffs declined to accept the payment of $2,-587.44 in full settlement and have retained the check without having cashed it.

It will be seen from what has been said above that the question presented by plaintiffs' petitions to recover the payments alleged to be due them for 1937 and 1938 under the statutes and regulations is whether the findings and decisions of the Secretary of Agriculture were correct and proper in the circumstances. More specifically, the question is the extent to which this court may review the findings and decisions of the Secretary of Agriculture in view of the character of the payments authorized by the statutes to be made and the nature of the agricultural programs, and the performances required of producers upon which the right to receive such bounties or payments were conditioned.

Plaintiffs insist that they worked in close cooperation with the appropriate Government officials; that they complied with the farm programs of the Department of Agriculture during the years 1933 to 1937, inclusive (there is no question as to compliance for 1938); that they were paid for the years 1933 to 1936, inclusive, on the basis of such compliance; that they have made a full disclosure of all the facts involved and the methods used by them in settling with their tenants and share croppers; and that the Government may not reopen those years because it is subsequently decided, on the same facts, that different amounts should have been paid to plaintiffs, or that a different distribution should have been made by them to their tenants and share croppers.

For the year 1937 (case 45997), plaintiffs say that they complied with the program as outlined by the Secretary and the regulations relating thereto and became entitled to receive a payment of $29,-261.78, and for the year 1938 (case 45779), plaintiffs rely upon the rule applied in United States v. Great Northern Railway Co., 287 U.S. 144, 53 S.Ct. 28, 77 L.Ed. 223, that in the absence of fraud or mistake of fact the action of the Agricultural Adjustment Administration in making original payments for 1933 to 1936, inclusive, was final and could not be reopened and reconsidered. Plaintiffs also say that defendant has the burden of proof with respect to the correctness of the offsets of the amount due for 1938 against payments made for the years 1933–1936, and that it has not sustained this burden.

Counsel for defendant say (1) that the payments which the Secretary of Agriculture was authorized to make in amounts determined by him to be fair and reasonable, were gratuitous grants and that this court does not have jurisdiction of a claim for such grants for participation in the soil conservation programs under the Soil Conservation and Domestic Allotment Act of February 29, 1936, as amended; (2) that the applicable statutes gave to the Secretary of Agriculture wide discretion and drastic power with respect to the making of such grants; that his determination with respect to the facts upon which any grant was to be made, and as to the amount thereof, was made conclusive, and that Congress manifested its intention in the various provisions of the statutes, and particularly in section 14, 49 Stat. 1151, of the Soil Conservation Act of February 29, 1936, and section 385, 52 Stat. 68, of the Agricultural Adjustment Act of 1938, 7 U.S.C.A. § 1385, that the opportunity which it was giving agricultural producers to receive grants, if they adopted prescribed soil conserving practices, was to be administered solely by the Secretary of Agriculture; (3) that plaintiffs are, therefore, bound by the determinations made by the Secretary, and involved in these cases, as to their noncompliance with the Agricultural Adjustment Act of 1933, Sec. 10(e), 48

Stat. 37, and the Soil Conservation and Domestic Allotment Act of 1936, Sec. 14; (4) that, in any event, the Government has the undoubted right to offset all or a portion of the amount due from it (for 1938) against overpayments determined to have been made to the claimants in other transactions for other years, and that plaintiffs' proof in the 1938 case is not sufficient to warrant a finding that this action of the Secretary of Agriculture was erroneous, arbitrary, or illegal.

The question of our jurisdiction to consider plaintiffs' claims should be first decided.

We are of the opinion that these cases are not governed by the decisions in United States v. Babcock, 250 U.S. 328, 331, 39 S.Ct. 464, 63 L.Ed. 1011, and Williamsport Wire Rope Co. v. United States, 277 U.S. 551, 561, 48 S.Ct. 587, 72 L.Ed. 985, especially relied upon by defendant, and other cases cited. The Babcock case involved a claim under the Act of March 3, 1885, 31 U.S.C.A. § 218 et seq., for loss of personal property of officers and enlisted men in the military service, which provided that such loss should be "examined into and determined" by the proper accounting officers of the Treasury and that the payment of the amount of such loss so ascertained and determined "shall be in full for all such loss or damage," and "That any claim which shall be presented and acted on under authority of this act shall be held as finally determined, and shall never thereafter be reopened or considered." The Court held that "These words express clearly the intention to confer upon the Treasury Department exclusive jurisdiction and to make its decision final." [250 U.S. 328, 39 S.Ct. 465.] From a study of the statutes involved in these cases, in the light of the reports of the congressional committees thereon, we do not find such clear language by Congress expressing its intention to confer upon the Department of Agriculture exclusive jurisdiction, and to make the decision of the Secretary, with respect to claims such as are here involved, final in all respects and not subject to further consideration by this court.

In the Williamsport Wire Rope Company case, supra, the statute vested discretionary authority in the Commissioner of Internal Revenue to grant relief to taxpayers from exceptional hardships by reason of having to pay abnormally high excess profits tax. Cf. Montgomery Ward & Company v. United States, 94 Ct.Cl. 309.

The statutes of February 29, 1936, and February 16, 1938, supra, involved in these cases, made specific provision for payment and fixed definite standards to be followed by the Secretary of Agriculture in making regulations to carry out the declared purposes of the statutes, and made it mandatory upon him to make the specified cash payments when agricultural producers had complied with the terms and conditions of the statutes and the regulations issued thereunder. Thus far we think it is clear that plaintiffs' suits present claims founded upon a law of Congress under 28 U.S.C.A. § 1491(2). Cf. Thomas v. United States, 16 Ct.Cl. 522, 527; United States v. Harmon, 147 U.S. 268, 275, 13 S.Ct. 327, 37 L.Ed. 164. There can be no question as to the power of Congress to provide for such payments. The fact that no contract existed between the parties nor the fact that the payments which the statutes provided should be made were grants or bounties, does not deprive the court of jurisdiction. F. Parlin, Executor v. United States, 1 Ct.Cl. 174, 2 Ct.Cl. 585; Campbell v. United States, 107 U.S. 407, 410–413, 2 S.Ct. 759, 27 L.Ed. 592; Grand Lodge v. New Orleans, 166 U.S. 143, 149, 17 S.Ct. 523, 41 L.Ed. 951; United States v. Realty Company, 163 U.S. 427, 16 S.Ct. 1120, 41 L.Ed. 215; The Manila Prize Cases (Dewey v. United States), 188 U.S. 254, 23 S.Ct. 415, 47 L.Ed. 463; Sampson v. United States, 35 Ct.Cl. 578; United States v. Weld, 127 U.S. 51, 54–57, 8 S.Ct. 1000, 32 L.Ed. 62; Mumford v. United States, 31 Ct.Cl. 210, 214–215; Maddux et al. v. United States, 20 Ct.Cl. 193, 198, 199; Drier v. United States, 70 F.Supp. 888, 108 Ct.Cl. 487.

However, in view of the nature of the grants; the purposes intended to be ac-

complished by the Soil Conservation and Domestic Allotment Act of 1936 and the Agricultural Act of 1938; the nature of the programs thereunder and the performances required of agricultural producers, and the provisions of the statutes vesting authority in the Secretary of Agriculture to determine the facts constituting the basis for any payment and the amount of the payment due, we are of the opinion that the extent of our jurisdiction in these cases is governed by the principles announced in Dismuke v. United States, 297 U.S. 167, 171–173, 56 S.Ct. 400, 403, 80 L.Ed. 561. In that case the court said:

"The United States is not, by the creation of claims against itself, bound to provide a remedy in the courts. It may withhold all remedy or it may provide an administrative remedy and make it exclusive, however mistaken its exercise. See United States v. Babcock, 250 U.S. 328, 39 S.Ct. 464, 63 L.Ed. 1011. But, in the absence of compelling language, resort to the courts to assert a right which the statute creates will be deemed to be curtailed only so far as authority to decide is given to the administrative officer. If the statutory benefit is to be allowed only in his discretion, the courts will not substitute their discretion for his. * * * If he is authorized to determine questions of fact, his decision must be accepted unless he exceeds his authority by making a determination which is arbitrary or capricious or unsupported by evidence, see Silberschein v. United States, 266 U.S. 221, 225, 45 S.Ct. 69, 69 L.Ed. 256; United States v. Williams, 278 U.S. 255, 257, 258, 49 S.Ct. 97, 73 L.Ed. 314; Meadows v. United States, 281 U.S. 271, 274, 50 S. Ct. 279, 74 L.Ed. 852, 73 A.L.R. 310; Degge v. Hitchcock, 229 U.S. 162, 171, 33 S.Ct. 639, 57 L.Ed. 1135, or by failing to follow a procedure which satisfies elementary standards of fairness and reasonableness essential to the due conduct of the proceeding which Congress has authorized, Lloyd Sabaudo Societa v. Elting, 287 U.S. 329, 330, 331, 53 S.Ct. 167, 77 L. Ed. 341. But the power of the administrative officer will not, in the absence of a plain command, be deemed to extend to the denial of a right which the statute creates, and to which the claimant, upon facts found or admitted by the administrative officer, is entitled. * * *

"The Commissioner is required by section 13, 'upon receipt of satisfactory evidence' of the character specified 'to adjudicate the claim.' This does not authorize denial of a claim if the undisputed facts establish its validity as a matter of law, or preclude the courts from ascertaining whether the conceded facts do so establish it. * * *"

In view of the provisions of the statutes, hereinafter referred to, concerning the findings of the Agricultural Adjustment Administration and the Secretary of Agriculture, we must accept such findings as conclusive since plaintiffs' proof fails to establish that the findings of the investigators, the officials of the Agricultural Adjustment Administration, and the Secretary of Agriculture were arbitrary or capricious. There was certainly evidence to support such findings and decisions, as is shown by our special findings of fact herein. These officials clearly followed a procedure which satisfied the standards of fairness and reasonableness.

Section 10(a) of the Agricultural Adjustment Act of May 12, 1933, provided for the appointment by the Secretary of Agriculture of the officers and employees of the "Agricultural Adjustment Administration, which the Secretary shall establish in the Department of Agriculture for the administration of the functions vested in him by this title." Subsection (c) vested in the Secretary of Agriculture authority, with the approval of the President, "to make such regulations with the force and effect of law as may be necessary to carry out the powers vested in him by this title * * *" and subsection (e) provided that "The action of any officer, employee, or agent in determining the amount of and in making any rental or benefit payment shall not be subject to review by any officer of the Government other than the Secretary of Agriculture or the Secretary of the Treasury." (Certain taxes were imposed by this Act and the Secretary of the Treasury was vested with au-

thority to make regulations with reference to the powers vested in him.)

Section 13 of the Soil Conservation and Domestic Allotment Act of February 29, 1936, provided as follows:

" * * * the Secretary [of Agriculture] is authorized and directed to provide for the execution by the Agricultural Adjustment Administration of such powers conferred upon him under sections 7 to 14, inclusive, of this Act as he deems may be appropriately exercised by such Administration * * *."

And Section 14 of this Act provided:

"The facts constituting the bases for any payment or grant or the amount thereof authorized to be made under section 7 or 8 hereof, when officially determined in conformity with rules or regulations prescribed by the Secretary of Agriculture, shall be reviewable only by the Secretary of Agriculture."

In Senate Report No. 1481, 74th Cong., 2d Session, on S-3780, which became the Soil Conservation and Domestic Allotment Act of February 29, 1936, the Senate Committee on Agriculture and Forestry said:

"Section 10 [13] provides that the Secretary is authorized and directed to provide for the execution by the Agricultural Adjustment Administration of such powers conferred upon him under the act as he deems may be appropriately exercised by such Administration and for such purposes the provisions of law applicable to the appointment and compensation of persons employed by the Agricultural Adjustment Administration shall apply. The purpose of this section is to facilitate the most economical and effective operation of the bill through the utilization of such of the existing personnel and organization as the Secretary finds adapted to carry out the purposes of the act.

"Section 11 [14] provides that notwithstanding any other provision of law, the action of any officer or employee, in determining the amount of or in making any payment under section 9 [8] shall not be subject to review or audit except by the Secretary of Agriculture. The purpose of this section is to make it clear that in providing for payments or grants to carry out the purposes of this bill during the period covered by section 9 [8], the Secretary shall not be required to refer to other governmental officials or employees for approval, questions relating to the qualification of individual producers or classes of producers to receive payments or grants inasmuch as such determinations require detailed appraisal of technical factors of farm practice relating to the purposes of the bill. The Secretary of Agriculture, alone, will have adequate facilities for making such determinations. The review of such determinations by other officials lacking such facilities would be likely to so delay and encumber the administration of the bill as to defeat the accomplishment of its objectives."

See, also, House Conference Report No. 2079, 74th Cong., 2d Session, page 11, on S-3780.

As hereinbefore stated, various sections of the Soil Conservation and Domestic Allotment Act of February 29, 1936, were amended by the Agricultural Adjustment Act of 1938, approved February 16, 1938, and many new and additional provisions were enacted covering matters and subjects not included in or covered by the Act of February 29, 1936. Section 389 of the 1938 Act, 7 U.S.C.A. 1389, continued the Agricultural Adjustment Administration and Section 385, entitled "Finality of farmers' payments and loans," provided as follows:

"The facts constituting the basis for any Soil Conservation Act payment, parity payment, or loan, or the amount thereof, when officially determined in conformity with the applicable regulations prescribed by the Secretary or by the Commodity Credit Corporation, shall be final and conclusive and shall not be reviewable by any other officer or agency of the Government."

When Congress intends to make administrative findings and decisions conclusive for all purposes and not subject to consideration by the courts, it usually expresses this intention in clear language. See Wilson & Company, Inc., v. United States, 30 F.Supp. 672, 90 Ct.Cl. 131; Id., 311 U.S. 104, 61 S.Ct. 120, 85 L.Ed. 71;

Swift & Company v. United States, 38 F.Supp. 435, 93 Ct.Cl. 705; Joseph E. Killian, Jr. v. United States 63 F.Supp. 748, 105 Ct.Cl. 393.

■■ The plaintiffs insist, with respect to the year 1938, for which it was found by the Secretary and is here admitted, that plaintiffs complied with the program and thereby earned and became entitled to receive $77,386.13; that defendant has the burden of proof of showing that the offset of $74,413.12 of this amount against payments made for the years 1933 to 1936, inclusive, was proper and justified, and that it has not sustained this burden. We think plaintiffs had the burden of proof of showing that the Secretary's findings and decisions were arbitrary or capricious, not only with respect to the year 1937 but also with respect to the offsets. Seaboard Surety Company v. United States, 67 F. Supp. 969, 107 Ct.Cl. 34, 44. They have not sustained this burden. The cases relied upon by plaintiffs in support of their contention that defendant has the burden of proof as to the offsets are not in point. They involved claims by defendant for offsets asserted for the first time in this court. Under the terms of the Acts of 1933, 1936, and 1938, supra, hereinbefore quoted, and R.S. § 236, 31 U.S.C.A. § 71, the Secretary of Agriculture clearly had the authority to determine and make the offsets in question and, for the reasons hereinbefore set forth, his findings and determinations with respect thereto are conclusive, unless shown to have been arbitrary. Dismuke v. United States, supra; Maddux et al. v. United States, supra. The record affords no basis for the conclusion that the Secretary of Agriculture did not properly apply the provisions of the statutes and the regulations to the facts found by him.

■ With respect to plaintiffs' contention that the Secretary of Agriculture could not legally reopen in 1941 the payments made for the years 1933 to 1936, inclusive, and decide that the distributions made by plaintiffs to their tenants and share croppers were improper and that different distributions should have been made, and that they had otherwise engaged in practices which tended to defeat the agricultural programs, it is sufficient to say, first, that plaintiffs have failed to show that they made a full disclosure to the Agricultural Adjustment Administration or to the Secretary of Agriculture, as to the basis on which they had made such distributions and had prepared their contracts for 1933–1935 and work sheets for 1936. The record does not show that the distributions, as made by the plantiffs and which are here involved, were approved either by the Agricultural Adjustment Administration, or the Secretary, prior to the investigations begun in 1939 and the decisions made by the Secretary in 1941.

The Secretary found and the evidence here shows, as set forth in the findings, that the distributions originally made by plaintiffs to certain of their tenants and share croppers were not made in accordance with the intent and purpose of the statute and the provisions of written instructions and regulations issued by the Secretary of Agriculture; and the evidence further shows that no one having authority so to do ever authorized the plaintiffs to depart from the regulations or to make the distributions on the basis on which they were made. The record also shows that neither the AAA nor the Secretary was aware, until the investigations were made, that plaintiffs had submitted certain of their contracts for 1934 and 1935 on the basis on which they were submitted and accepted, or of the practices in which plaintiffs engaged in submitting their work sheets for themselves and their tenants for 1936.

Plaintiffs are, therefore, not entitled to recover.

■ Defendant has filed a counterclaim for 1937, in which it seeks to recover $590.64 paid to the Keiser Supply Company, a partnership. Plaintiffs owned a controlling interest in this partnership. One R. H. Robinson was the other partner. He operated a store and cotton gin at Keiser, Arkansas. The facts are set forth in findings 94 and 95. The partnership leased 640 acres from the Keiser School District, for which it paid a cash rental of $6,000. This land had a cotton base acreage of 350 acres. The partner-

ship filed separate "work sheets" for this land which it rented to tenants. Only 294.4 acres were planted to cotton and the partnership was paid $590.64 for diverting 60.6 acres. The partnership and its tenants, therefore, complied with the statute and the regulations and the entire amount received was distributed to the tenants. These facts are admitted.

Since the facts found by the Secretary of Agriculture show that there was compliance by the partnership, and since there was no finding and the evidence does not show, that *plaintiffs* had this land operated through the partnership for the purpose of defeating the purposes of the agricultural program, as outlined in the regulations, we think the partnership was entitled to the payment received by it, and we find no reason, upon the evidence submitted, for holding that the defendant should recover from the plaintiffs the payment which was earned by the partnership and paid over by it to its tenants. The Secretary of Agriculture did not find that plaintiffs had by their conduct rendered themselves liable for the repayment of this sum.

The basis of the counterclaim is that since the Secretary found that plaintiffs adopted practices which resulted in overplanting of cotton on lands separately owned and operated by them and their tenants, the 560 acres of land leased by the partnership from the school district and cultivated by tenants of the partnership should be included in and combined with plaintiff's plantation. In the circumstances we think this would not be proper under the facts; the statute and regulations. The school land was a separate and distinct farm.

The plaintiffs are not entitled to recover, and their petitions are dismissed.

The defendant is not entitled to recover from plaintiffs on its counterclaim, and the counterclaim is also dismissed.

It is so ordered.

HOWELL and MADDEN, Judges, concur.

JONES, Chief Judge (dissenting in part).

I cannot agree to all the conclusions reached by the majority.

I agree that no amount is due plaintiffs for 1937. However, since plaintiffs fully complied with the program in 1938, defendant concedes that plaintiffs are entitled to payment for that year, except for the offsets which it asserts should be charged against the sum of $77,386.13 that is otherwise due for the year 1938.

As to some of these offsets we are in accord, but when the record is read in the light of the conditions then prevailing and considering the hurried nature of the early program, some of these offsets cannot in fairness and justice be charged against the amount due plaintiffs.

To get any sort of conception of the difficulties one must recall the conditions—and this is disclosed in the record—that prevailed in the early days of the program.

Millions of hungry people were shuffling in the bread lines, helpless, hopeless, and despairing. Smokestacks were rusting in idleness and business was at a standstill. Vast production was rotting in the fields, because there was scant market and little purchasing power, and prices would not justify the gathering or harvesting of the crops. Banks were going broke by the thousands and people generally were desperate.

To help meet this tragic situation farm legislation was hurriedly prepared and the Department of Agriculture was given the gigantic task of fashioning a program and putting it into immediate effect. There was not time to spell out all the details. Quick action was vital. It was thought wise to prepare a general program and leave many of the details to local state, county, and community committees.

Cotton was one of the commodities requiring emergency action. There were more than two and one-half million individual cotton farmers. It was a tremendous assignment.

At the outset it should be observed that the principal issues in these cases arise by reason of defendant's plea of set-off and that that plea of set-off is based upon an investigation made long after the contracts

or participating arrangements between plaintiffs and the Agricultural Adjustment Administration had been fully performed. In other words, plaintiffs entered into certain arrangements with the Agricultural Adjustment Administration for participation in the various farm programs, and after approval of performance thereunder plaintiffs were paid the amount certified by the appropriate officials of the Agricultural Adjustment Administration as due thereunder. While the plea of set-off makes various allegations as to fraud and misrepresentation, and such allegations were, of course, admitted for the purpose of the demurrer by plaintiffs which was overruled, insufficient evidence was adduced to establish fraud, and it is not understood that defendant is contending that there was any fraud or misrepresentation on the part of plaintiffs in carrying out their participation in the various farm programs. In fact, on the principal items involved, it is clear that what plaintiffs did, which defendant now complains about, was fully explained to the County Agent and the County Committee, and was approved by them.

The investigation covered the years 1933–37 and was made in 1940. The Investigating Committee prepared a report in which it recommended that certain amounts be charged to plaintiffs as having been overpaid to them by reason of their participation in various programs. That report was considered by a Joint Committee which consisted of a County Committee and a State Committee. In some instances, the Joint Committee disagreed with the Investigating Committee. Thereafter, the Acting Director of the Southern Division of the Agricultural Adjustment Administration submitted a memorandum of recommendations to the Secretary of Agriculture with respect to the report of the Investigating Committee and Joint Committee, which, in most respects, followed the recommendations of the Investigating Committee. The Acting Secretary of Agriculture approved the recommendations of the Acting Director. However, it should be noted from the findings set out on page 129 of the record that it was apparently done as a basis for the settlement of the issues raised by the investigation.

With respect to finality, the determination of the Secretary of Agriculture in this instance long after performance and payment is something very different from determinations made by the Secretary of Agriculture in the course of carrying out contracts. At least it would seem that where, under such circumstances, the defendant now seeks by way of set-off to collect from the plaintiffs for these alleged overpayments the burden should be on the defendant of establishing the amounts claimed. I do not think it can satisfy that burden merely by pointing to the approval of the report by the Secretary of Agriculture.

### 1933 Cotton Adjustment Program

The amount of $23,009.69 allegedly withheld improperly by plaintiffs from their tenants under the 1933 Cotton Adjustment Program arises under two issues: (1) Whether the plaintiffs' tenants were entitled to participate under the cash and cotton option plan or under the straight cash plan, and (2) whether plaintiffs were required to divide the amounts received under the program on the basis of the interest in the crops at the beginning of the crop season, or whether plaintiffs and the tenants could make some other arrangement for the distribution of the proceeds.

The 1933 program was promulgated in the latter part of June 1933 after cultivation of the cotton was practically completed and farmers were to submit their offers to participate by July 8, 1933. This program was entirely new to the farmers, and plaintiffs in common with many other farmers were reluctant to sign an offer of participation until they knew more about the program. However, the Agricultural Adjustment Administration was extremely anxious to get the program into operation, and because of the size of plaintiffs' holdings and the effect of their signing upon other farmers who had not signed, strongly urged plaintiffs to sign up for participation.

Plaintiff J. H. Crain testified that Cully Cobb, the official in the Agricultural Adjustment Administration charged with putting the program into effect, called him in Memphis from Washington and urged

886

plaintiffs to sign an offer of participation. Mr. Crain explained to Mr. Cobb that there would not be time to get the offer signed by all tenants who would participate and have the offer filed within the time suggested by him. Mr. Cobb then asked Mr. Crain to get the contract signed without awaiting the signatures of the tenants and work it out with the tenants later. Plaintiffs accordingly signed Contract No. 2000 without awaiting the signatures of the tenants. What Mr. Cobb testified to was that so far as he could remember at the time, he did not make the statements attributed to him, but he would not say that he did not have such conversation. In view of the positive testimony of Mr. Crain and the circumstances existing at the time which would have made it entirely reasonable for Mr. Cobb to have made such statements, we have found in finding 13 that Mr. Cobb urged plaintiffs to sign the offer of participation without waiting to secure the signatures of the tenants and to work out the terms of their participation with them later.

After that conversation, plaintiffs signed an offer to plow up 7,000 acres of cotton for a cash payment of $12 an acre and an option to purchase approximately 4,200 bales of cotton at six cents per pound. The contract was not signed by any of plaintiffs' tenants or share croppers. That contract was accepted by the Secretary of Agriculture after appropriate recommendations from the various subordinate officials. After the offer of participation had been signed by plaintiffs, plaintiffs explained the program to their tenants and share croppers and invited them to participate under the contract. The tenants and share croppers were given the option in accordance with the program either to receive a share of the benefit on the basis of $20 per acre or on the basis of $12 per acre, plus a cotton option in accordance with plaintiff's contract, and all of them who came in on the contract elected to take the cash payment of $20 per acre. In carrying out the contract, plaintiffs received $29.16 per acre for the acreage covered by the contract—that is, cash of $12 at the time of the execution of the contract and $17.16 of profit realized under the cotton option plan because the price of cotton rose during that period.

However, they made the division with the tenants on the basis of $20, and that was done without waiting to determine whether plaintiffs would make a profit under the cotton option plan.

The court saw fit to delete the last sentence of the first paragraph of the commissioner's finding 18, which reads as follows:

"The tenants and share croppers were given the option in accordance with the program presented by the AAA either to receive a share of the benefit on the basis of $20 per acre or on the basis of $12 per acre plus a cotton option in accordance with plaintiffs' contract, and all of them who came in under the contract elected to take the cash payment of $20 per acre."

In my judgment that finding is fully supported by the testimony.

Defendant is here contending that plaintiffs should be required to account to their tenants on the basis of $29.16 rather than $20. I find nothing in the argument which convinces me that defendant's position can be sustained. In the first place, it seems entirely logical that the tenants and share croppers would have agreed to accept the cash payment of $20 as a sum certain rather than $12, and not only take a chance on whether they would receive more but also have to wait to receive the additional amount. Plaintiffs' testimony is uncontradicted that the tenants and share croppers entered into the program on that basis. I cannot take too seriously the argument that these tenants and share croppers were too ignorant to know what they were doing when they agreed to participate on the cash basis rather than the cash and option basis. I am thoroughly convinced from the record that what they did was what many other well-informed people would have done.

With such an agreement between plaintiffs and their tenants and share croppers, it is difficult for me to see how it now can be said that the agreement should be disregarded and that plaintiffs should be required to make a distribution to them under the cash and option plan where plaintiffs took all the risk, and it happened to turn out more profitably for plaintiffs than if they had taken the straight cash payment

plan. Certainly, if plaintiffs had realized less than $20 it would be hard to justify recoupment from the tenants out of the $20 per acre which they were paid. The Joint Committee recommended that the settlement with the tenants on the basis of $20 per acre be allowed to stand and that is the course that should be taken. The amount withheld under this item was $16,321.54.

The further question under the 1933 program concerns the percentage or fractional division between plaintiffs and their tenants and share croppers of the payments received by plaintiffs from defendant. The only written instructions available at that time to guide the interested parties were certain instructions which had been issued to field workers, one sentence in which read as follows:

"It is assumed that agreements by the operators and their tenants will provide for division of payments in proportion to their interest in crop."

No regulations had been issued on this point or were ever issued covering this matter for the year 1933. The matter was extensively discussed in various meetings which were held by the producers, operators, County Agent, and County Committee. At that time, plaintiffs and other producers urged that since the cotton had been planted and its cultivation practically completed by the tenants and share croppers, it would be inequitable to have the tenants and share croppers participate in the payments under the plow-up program in the same manner as agreed upon for shares in the crop at the beginning of the crop season, for the reason that by the destruction of the cotton the tenants and share croppers would be saved the labor or expense of picking it and, in addition, landlords situated as were plaintiffs would lose revenue from getting the cotton destroyed. The County Agent informed the producers, including plaintiffs, that, under his interpretation of the instructions, it would be permissible for the landlords and their tenants and share croppers to agree upon the division of the payments different from that provided in their agreements at the beginning of the crop season.

When the County Agent sought advice from higher officials on the question, he was told that it was a matter for him and the subordinate committees to work out under the instructions he had received. As a result of these discussions, plaintiffs entered into agreements with their tenants and share croppers for division of the cash payments on a basis different from that which they had for division of the crops, and plaintiffs distributed the payments on the new basis. For example, in a case where a tenant was operating on the basis that he would have been entitled to receive three-fourths of the cotton and the plaintiffs one-fourth, the new arrangement was that the tenant would be receiving two-thirds of the payments and plaintiffs one-third of such payments.

What the Investigating Committee recommended, which was approved by the Acting Secretary of Agriculture, and what the defendant is now contending for is that the payments should be distributed on the basis which existed at the beginning of the crop season rather than on the basis of the agreement entered into between plaintiffs and their tenants and share croppers. In the first place, we do not have, in this instance, a regulation promulgated by the Secretary of Agriculture, but merely instructions to field workers, which instructions are far from clear as to their true meaning. When a question arose about these instructions at the time in question, the County Agent advised plaintiffs that they could do what they actually did. There was no concealment. The new arrangement was certainly fair to the tenants and share croppers in that they were not only saved the additional expense incident to picking the cotton but also they were permitted by plaintiffs to have the land rent-free on which the cotton was plowed up to raise a crop of corn, and many of them used the land in that way. In fact, some of them anticipated the final working out of the program by planting corn between the cotton rows on the portion of the crop which they expected to plow up.

In view of the foregoing, it is difficult for me to see why the arrangement made between plaintiffs and their tenants and share croppers and carried out should now be disregarded and plaintiffs should be re-

quired to make a division on the basis of the crop arrangements. I would deny the plea of set-off on this item, amounting to $6,688.15.

In the years 1934, 1935, and 1936 the regulations were more specific and the programs more clearly outlined and understood. While we have doubt as to whether all the items should have been charged against the plaintiffs for those years, the record is not clear as to some of them and the court does not have jurisdiction as to others. In the state of the record I do not feel the court can allow plaintiffs to recover for any of those years.

It is difficult to lay a straightedge to the vast, new, and complicated farm program that was made effective in 1933. There were numerous commodities. There were six millions of farmers living thousands of miles apart. The details were staggering and the human equation was baffling.

Yet a program was necessary. For more than 100 years the surplus-producing farmer had borne the burdens of the tariff without any corresponding benefits. The result had been a lopsided development that had destroyed purchasing power until the entire business set-up was locked and sinking.

The farm program was basic. It was the mudsill on which the structure of a continuing stabilized economy was to be builded. Cooperation was needed if the plan was to succeed.

The record is convincing that the plaintiffs worked more closely with those who were conducting the program than did many of the large operators. In fact, some refused to comply in any way.

Information was difficult to get. Regulations were scant and in the early days many phases were left largely to the state and county extension service and local committees. That it succeeded as well as it did is next door to a miracle. It is a tribute to the Extension Service, the AAA organization and the farmers themselves.

In the circumstances I do not deem it just to penalize those who cooperated, if there was substantial compliance.

I do not feel it just to permit the Secretary of Agriculture in 1941 to deny payment of amounts due under the 1938 program by subtracting certain items that had been approved and paid for the year 1933.

Where there were errors in calculation, yes, those errors should rightly have been corrected and offset. But to permit the policy to be changed after the work had been approved and payments made is not in the province of the Secretary.

Admittedly the Secretary was given full authority to make final determinations, but having made them, at least in effect and by his action, I do not think a later Secretary had authority to reopen and change the basis of payments. Cotton v. United States, 29 Ct.Cl. 207, 225; Hartson v. United States, 21 Ct.Cl. 451.

There were errors of calculation in those earlier years. These should have been and were corrected. There were also some honest mistakes of the rights under the law and regulations of that period. These, too, were corrected. But to permit employees to go prowling through the record of distant years to find instances in which policies could be changed and thus avoid payment of admitted just claims in later years, is beyond the power and authority of the Department.

I would find for the plaintiffs in the sum of $23,009.69, the amount charged against plaintiffs for two of the items of payment for the year 1933.

Judge WHITAKER concurs in this opinion.