**RALSTON STEEL CORPORATION, Assignee of Morgan Manufacturing Corporation,**

v.

**The UNITED STATES.**

**No. 155–59.**

United States Court of Claims.

Jan. 22, 1965.

Max A. Reinstein, Chicago, Ill., for plaintiff. Harold C. Havighurst, Chicago, Ill., of counsel.

Sidney J. Wolf, Chicago, Ill., for Harry L. Lieberman, Herman C. and Nizzie B. Lieberman, and Eli J. and Jean Lieberman, Third Parties.

Julian L. Berman, Chicago, for intervenors Leo J. Schwartz and Arthur S. Freeman, doing business as Schwartz & Freeman.

Sheldon P. Migdal, Washington, D. C., with whom was Asst. Atty. Gen., Louis F. Oberdorfer, for defendant. Edward S. Smith, Lyle M. Turner and Philip R. Miller, Washington, D. C., were on the brief.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

DAVIS, Judge.

Receding from an arrangement it once made to advance money to settle the federal tax liabilities of unrelated taxpayers, plaintiff now seeks to recover that sum from the Federal Government. In 1951, the Banner Bed Company and its stockholders, the Liebermans, owed federal income taxes substantially in excess of $50,000. For reasons of his own, Morris Rubin, who owned and controlled plaintiff but was not connected with Banner or the Liebermans, decided to make available $50,000 for use in compromising these obligations of the others; he wished, though, to make sure that he would get this money back if the Government rejected or took no action on the compromise. To protect this interest, plaintiff's wholly owned subsidiary (Morgan Manufacturing Corporation)[1] handed over the money to a firm of lawyers (Schwartz & Freeman) as escrow agents, under an agreement that the money was to be used to settle the tax liability of the others, but on condition that any offer to the Internal Revenue Service was to expire on March 15, 1952, and also that if the offer was not accepted by that date, or if it was earlier rejected, the money was to be returned to the escrow agents for delivery to Morgan. An offer in compromise in the amount of $50,000 was then made by Banner and the Liebermans, stating that the money had been "borrowed" and was to be returned to Schwartz & Freeman if the offer was rejected or if no final action was taken by March 15, 1952. On the same day the escrowees sent a letter to the Service, enclosing a certified check of their own, and asking that it be returned in the same circumstances.

No action was taken by the Service for some time. In 1953, the deadline in the offer (of March 15, 1952) was eliminated with plaintiff's consent, and the Service was told that the money was to be returned to the escrow agents only in case of rejection. In 1957, the Service informed the several taxpayers that, to remedy technical objections, separate compromise offers would have to be made for each, in place of the lump sum offer previously tendered on behalf of all. As a result, later in the same year, separate

---

1. Plaintiff brings this action as the successor in interest of its subsidiary, Morgan Manufacturing Corporation, which was created in late 1950 and continued in business until the end of December 1951, at which time plaintiff purchased its assets. At some later date, Morgan was dissolved.

offers totalling $50,000 were made for the individual taxpayers; Banner Bed Company (which by then was practically dead) was entirely eliminated. The funds which came from plaintiff remained on deposit for use in connection with the revised compromise offers. The plaintiff's escrow agents were aware of and approved the change and there is no reason to think that they exceeded their authority or acted contrary to plaintiff's wishes.

By the close of 1958, the Internal Revenue Service had not yet acted on the revised offers but the plaintiff, again for reasons of its own, was no longer willing to continue with the arrangement. In January 1959, the plaintiff, through its escrow agents, demanded the return of the funds. Upon refusal of its demand by the Service, plaintiff instituted suit in this court. In 1962, while the suit was pending, the Commissioner of Internal Revenue accepted the individual revised offers of compromise, subject to this court's determination that defendant was entitled to retain the funds.[2]

Two major issues are presented: (1) Does the court have jurisdiction over this action brought by a nontaxpayer to retrieve its funds deposited with the Government in connection with an offer for the compromise of tax deficiencies assessed against a third party? (2) If the court has jurisdiction, does the plaintiff or the escrow agency meet the conditions under which a nontaxpayer providing such funds has the right to withdraw them?

2. The individual taxpayers are third-party defendants here, and Schwartz & Freeman, the escrow agents, are intervenor-plaintiffs. Banner Bed Company, the corporate taxpayer for which the compromise offer was originally made but which was later eliminated, is not a party.

3. In fuller text, Treasury Regulation § 301.7122–1(d) (4) provides: "An offer in compromise may be withdrawn by the proponent at any time prior to its acceptance. In the event an offer is re-

## I. *Jurisdiction*

Our general jurisdictional statute, 28 U.S.C. § 1491, confers power on this court to render judgment on "any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." Plaintiff alleges four separate jurisdictional grounds. i. e., that its action is founded upon provisions of the Internal Revenue Code and the Treasury Regulations, as well as upon an implied contract with the United States, and that its suit is for liquidated damages not sounding in tort. The defendant denies that we have jurisdiction under any of these heads.

Section 7122 of the Internal Revenue Code of 1954 gives the Secretary of the Treasury (or his delegate) authority to compromise criminal and civil tax cases (prior to reference to the Department of Justice), and prescribes the procedure by which formal compromises may be effected. Section 7809 provides for the placement of funds offered in compromise in a deposit fund account, and for the return of such funds to the offeror in the event of rejection by the Secretary of the Treasury. Treasury Regulation on Procedure and Administration (1954 Code), § 301.7122–1(d) (4), states that "an offer in compromise may be withdrawn by the proponent at any time prior to its acceptance." [3] Plaintiff claims entitlement to the $50,000 under these statutes and the regulation.

jected, the proponent shall be promptly notified in writing. Frivolous offers or offers submitted for the purpose of delaying the collection of tax liabilities shall be immediately rejected. If an offer in compromise is withdrawn or rejected, the amount tendered with the offer, including all installments paid, shall be refunded without interest, unless the taxpayer has stated or agreed that the amount tendered may be applied to the liability with respect to which the offer was submitted."

Nevertheless we are without jurisdiction, defendant insists, because these provisions, properly interpreted, do not grant plaintiff the rights it asserts, and therefore its claim is not in truth "founded" upon an Act of Congress or an executive regulation, as 28 U.S.C. § 1491 requires. This contention wrongly equates the issue of jurisdiction with the merits. "As frequently happens where jurisdiction depends on subject matter, the question whether jurisdiction exists has been confused with the question whether the complaint states a cause of action." Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 341 U.S. 246, 249, 71 S.Ct. 692, 694, 95 L.Ed. 912 (1951). See, also, Romero v. International Terminal Operating Co., 358 U.S. 354, 359, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959). Defendant in effect advocates that a determination, on the merits, that a plaintiff does not fall within the class upon whom rights are conferred by the statute or regulation upon which his case is based necessarily entails a holding that this court was without jurisdiction *ab initio*. That is not the way to decide this court's jurisdiction—any more than it would be correct to argue that a district court was without jurisdiction under 28 U.S.C. § 1331, when asked to rule that a complainant had certain rights under the Constitution or other federal authority, because it ultimately held that those rights had not been given. See Montana-Dakota Utilities Co. v. Northwestern Public Service Co., supra; Bell v. Hood, 327 U.S. 678, 681–682, 66 S.Ct. 773, 90 L.Ed. 939 (1946); Levering & Garrigues Co. v. Morrin, 289 U.S. 103, 105, 53 S.Ct. 549, 77 L.Ed. 1062 (1933); The Fair v. Kohler Die & Specialty Co., 228 U.S. 22, 25, 33 S.Ct. 410, 57 L.Ed. 716 (1913). If the plaintiff asserts that his claim "arises under" or is "founded" on federal legislation or regulation (see

United States v. Emery, Bird, Thayer Realty Co., 237 U.S. 28, 32, 35 S.Ct. 499, 59 L.Ed. 825 (1915)), '[t]o determine whether that claim is well founded," the court "must take jurisdiction, whether its ultimate resolution is to be in the affirmative or the negative." Montana-Dakota Utilities Co. v. Northwestern Public Service Co., supra, 341 U.S. at 249, 71 S.Ct. at 694. It is "well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy. If the court does later exercise its jurisdiction to determine that the allegations in the complaint do not state a ground for relief, then dismissal of the case would be on the merits, not for want of jurisdiction." Bell v. Hood, supra, 327 U.S. at 682, 66 S.Ct. at 776. "Unsuccessful as well as successful suits may be brought" upon a federal act or regulation. The Fair v. Kohler Die & Specialty Co., supra, 228 U.S. at 25, 33 S.Ct. at 411.

These same principles have applied, and still apply, to this court, within the ambit of its limited jurisdiction. In general, a claimant who says that he is entitled to money from the United States because a statute or a regulation grants him that right, in terms or by implication, can properly come to the Court of Claims, at least if his claim is not frivolous but arguable.[4] Where an Act of Congress (e. g., United States v. Emery, Bird, Thayer Realty Co., supra, 237 U.S. at 30–32, 35 S.Ct. 499 (1915)) or an executive regulation (e. g., Greene v. United States, 376 U.S. 149, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964) (competence

---

4. On the qualification of non-frivolity and substantiality, see Montana Catholic Missions v. Missoula County, 200 U.S. 118, 130, 26 S.Ct. 197, 50 L.Ed. 398 (1906); The Fair v. Kohler Die & Specialty Co., supra, 228 U.S. at 25, 33 S.Ct. 410; Levering & Garrigues Co. v. Mor-

rin, supra, 289 U.S. at 105–106, 53 S.Ct. 549; Bell v. Hood, supra, 327 U.S. at 682–683, 66 S.Ct. 773; Montana-Dakota Utilities Co. v. Northwestern Public Service Co., supra, 341 U.S. at 249, 71 S.Ct. 692.

of this court not questioned)) arguably confers such rights upon the claimant, the court will assume jurisdiction and decide his case on the merits, even though the defendant may ultimately prevail.[5] See, e. g., South Puerto Rico Sugar Co. Trading Corp. v. United States, Ct.Cl., 334 F.2d 622, 626–627, 636–637, decided July 17, 1964. Cf. United States v. Ohio Oil Co., 163 F.2d 633, 635–636, 642 (C.A. 10, 1947), cert. denied, 333 U.S. 833, 68 S.Ct. 459, 92 L.Ed. 1117 (1948); Clapp v. United States, 117 F.Supp. 576, 578–579, 127 Ct.Cl. 505, 509–511 (1954); Crain v. United States, 84 F.Supp. 876, 880–881, 114 Ct.Cl. 94, 183–185 (1949). In this instance, there is no doubt that plaintiff, as well as the intervening escrow agents, have an arguable case, both with respect to Sections 7122 and 7809 of the Code and under Section 301.7122–1(d) (4) of the Treasury Regulations.[6]

■■ Like reasoning sustains the alternative point that this court has jurisdiction on the basis of a contract implied in fact between plaintiff (or the escrow agents) and the Treasury Department. When an action is founded on an Act of Congress or an executive regulation, as this one is, there of course need be no implied agreement with the United States as an independent ground for jurisdiction. E.g., Crain v. United States, 84 F.Supp. 876, 880, 114 Ct.Cl. 94, 184 (1949). However, since we shall find it necessary to consider the contract claim on the merits, we must also pass on this additional ground for jurisdiction. Both plaintiff and the escrowees assert that, when they tendered $50,000 to the Collector of Internal Revenue in connection with the taxpayers' compromise offer, they stipulated certain conditions under which those funds were to be returned. When the Government accepted the funds, they claim, it in effect accepted this conditional offer, thus creating a contract implied in fact. By failing to return the money upon request, the defendant (it is said) breached a contractual condition. If sustained, these factual allegations would arguably show an actual contract between the plaintiff (or the agents) and defendant; the court therefore has jurisdiction to decide the issue. In a case with less indicia of an actual consensual transaction, Kirkendall v. United States, 31 F.Supp. 766, 90 Ct.Cl. 606 (1940), we held that, when the Government improperly seized funds of the plaintiff and applied them to the tax indebtedness of a third party, this court had jurisdiction and could allow recovery under a contract implied in fact. Catalina Properties, Inc. v. United States, 166 F.Supp. 763, 143 Ct.Cl. 657, 660 (1958), distinguished Kirkendall on the ground that the defendant had not in fact received any funds belonging to that plaintiff. Here the Government received, and still possesses, money which came from the plaintiff; in addition, we have these complainants' assertion of an actual consensual transaction. J. C. Pitman & Sons v. United States, 317 F.2d 366, 161 Ct.Cl. 701 (1963) also

---

5. Where an action rests upon a statute or regulation, that particular enactment need not contain a specific provision permitting a suit for money; our general jurisdictional statute, 28 U.S.C. § 1491, serves the purpose. Simon v. United States, 113 Ct.Cl. 182, 190–191 (1949).

6. In United States v. Babcock, 250 U.S. 328, 39 S.Ct. 464, 63 L.Ed. 1011 (1919), cited by defendant, it was held that the Court of Claims lacked jurisdiction because Congress had specifically provided that the jurisdiction of the Treasury Department over the claim in issue was exclusive and that its decision was to be final. There is no such exclusionary provision in this case. In Roden Coal Co. v. United States, 95 Ct.Cl. 219, 231 (1941), cert. denied, 317 U.S. 636, 63 S.Ct. 28, 87 L.Ed. 513 (1942), plaintiff, in claiming damages for injury to his property caused by the defendant's dredging operations, relied on a Congressional Act providing for maintenance of the waterway being dredged. The court seems to have held that plaintiff did not even arguably make a case that that statute gave any right to monetary relief; or possibly the opinion may have inadvertently used jurisdictional language in ruling that the plaintiff failed to state a claim on the merits under that piece of legislation.

cited by defendant, turns on that plaintiff's status as a volunteer rather than upon any jurisdictional determination; the decision went to the merits. As in J. C. Pitman & Sons, the court here has a valid jurisdictional basis on which to proceed, although we rule in the end that plaintiff and the intervenors are not entitled to recover.[7]

■ As its last assault on jurisdiction, the defendant cites United States v. Sherwood, 312 U.S. 584, 588, 61 S.Ct. 767, 85 L.Ed. 1058 (1941), for the position that in any event this court lacks authority over a suit against the United States when, as a prerequisite to recovery, it would have to decide the rights of private parties *inter se*. But plaintiff's claim against the Federal Government, as founded upon statutes and the Treasury Regulation, requires no determination of the rights of private litigants among themselves. Furthermore, in Sherwood the complainant was merely a judgment creditor seeking to recover against the United States for breach of the latter's contract with the judgment debtor. Here, plaintiff and the escrowees assert a direct relationship with the defendant and the latter is not simply in the position of a garnishee. If plaintiff or its agents have an implied contract with the United States, this court can determine the rights of these contracting parties without necessarily determining the rights of the other private litigants. The dictum in the Sherwood opinion pertains only to those cases where this court cannot enter judgment against the Government without first making a binding *adjudication* of the rights of one private person against another. The Supreme Court did not say or intimate that this court can never take account of the rights of private persons *inter se*. It has often done that in deciding a claim against the United States.

## II. *Merits*

■ Of the two provisions of the Internal Revenue Code on which this claim is founded, it is more obvious that Section 7122 does not, expressly or impliedly, grant any right to recover the $50,000. That section merely authorizes formal compromises and prescribes certain procedures not now relevant; nothing in it deals with the deposit or return of monies. Section 7809 is more pertinent since it provides for the special deposit of sums offered in compromise and that "upon the *rejection* of any such offer, the Secretary or his delegate shall refund to the *maker of such offer* the amount thereof" (emphasis added). Most relevant of all is the Treasury Regulation, footnote 3, supra, which declares that "an offer in compromise may be withdrawn by the *proponent* at any time prior to its acceptance" (emphasis added). We discuss the regulation first, then section 7809.

■ We assume, without deciding, that the term "proponent" covers certain classes other than the taxpayer. The regulation seems deliberately to use "proponent" instead of taxpayer; the official form for an offer in compromise (Form 656) also seems to use "proponent" as distinct from "taxpayer"; and the form for Statement of Financial Condition and Other Information (to be filed with an offer in compromise) (Form 433), at least in its current version, expressly requests, "if proponent is not taxpayer," the proponent's name, address, and "relationship to taxpayer (partner, president, father, etc.)." But we think, in any event, that the "proponent" must be a person who submitted the offer in compromise (perhaps together with the taxpayer), not simply one who advanced or supplied the funds accompanying the offer. It is natural to interpret "proponent" as a person who

7. Plaintiff also contends, on the basis of the language in 28 U.S.C. § 1491, that this court possesses jurisdiction in any suit for liquidated or unliquidated damages not sounding in tort. Since we have jurisdiction under the three grounds previously discussed, we need not pass on this question. As indicated in footnote 12, infra, the result on the merits would be no different under this fourth head of jurisdiction.

proposed or made the offer, i. e., an offeror. The offer, of course, is the offer-in-compromise, and a proponent would be one who made that proposal to the Internal Revenue Service. As English is normally used, it would be strained to read the word as including one who is no more than the source and owner of the money transmitted for the potential settlement. And there would be great practical difficulties for the Government, if "proponent" were given the latter meaning, in determining precisely who owned the sums submitted with the compromise offer.

The circumstances surrounding the settlement offer in this case afford an excellent example of the practical burdens. The vehicle through which came the funds for the offer was an escrow agreement under which the plaintiff, as "Lender", gave $50,000 to the escrow agents (Schwartz & Freeman) for deposit with the Internal Revenue Service "to settle the aforesaid liabilities of the Borrowers" (the taxpayers). The alleged consideration for tendering the $50,000 was specified in a collateral agreement to the terms of which plaintiff seemingly assented orally, but which it never signed. By that agreement, plaintiff's obligation to retain the corporate taxpayer (Banner Bed Company) as its sales agent was curtailed in return for the $50,000 loan. Stating that it never finally entered into this agreement, plaintiff strenuously objects to any inferences to the contrary which may be drawn from the findings. See finding 10(b). Plaintiff alleges that, instead, the loan agreement with the taxpayers (Banner Bed Company and the Liebermans) was to become effective only if the compromise were accepted by the Government. Until then, the plaintiff contends, only a loan offer had been made, which could be revoked at any time because not supported by consideration; until then, the money belonged wholly to plaintiff and the taxpayers had no rights in it.

For the purposes of our decision, it is not necessary to pass upon these disputed questions. The point is that the existence of the dispute, in itself, adumbrates the problems which would face the defendant in determining the true owner of the funds so as to permit their withdrawal by someone other than the offeror (or the taxpayer). When an outside person provides the funds, a multitude of potential arrangements and relationships may be created. The funds may be loaned for a specific time period or for an indefinite period ending with the acceptance or rejection of the compromise by the Government; they may be given in connection with a loan agreement providing for their unrestricted use, or they may be given only for use as a compromise offer; or there may not be a loan at all, but rather a gift or the repayment of a debt, etc. The permutations are many, and each variation may affect ownership. To determine the true owner, the Government would often have to examine the documents back of a compromise payment, and to take other steps necessary to ferret out the interested persons, the nature of the relationship, and the purpose of the transaction by which the offeror received the funds. This would be a continuing and recurrent burden, possibly a complex and protracted one. Moreover, if the Government turned out to be mistaken, it would find, not only that it had lost a good compromise offer, but that it must also repay the same amount to the actual legal owner. These are troublesome tasks and risks which the Internal Revenue Service could shoulder, if it wished, but we think that if it had done so it would have used more explicit language than the one word "proponent." Cf. J. C. Pitman & Sons v. United States, 317 F.2d 366, 369–370, 161 Ct.Cl. 706–707.

For these reasons, practical and textual, we hold that "proponent", as used in this Treasury Regulation, does not go beyond an offeror and, more especially, does not impose any duty on the Government to determine the real owner

of the funds accompanying the offer.[8] Under that reading, plaintiff and the intervening escrowees have no rightful claims since neither can be deemed an offeror. The offer was signed and submitted by Banner Bed Company and the Liebermans; they also supplied the financial statements. The escrow agents were merely described as the source of the "borrowed" funds accompanying the offer; plaintiff was not mentioned at all in the offer. The submission, even as expanded to include the escrow agents' contemporaneous letter forwarding their check, said only that the money was to be returned to Schwartz & Freeman if no final action was taken by March 15, 1952 (a limitation which was later removed), or if the offer was rejected. See findings 13–14. Nothing was said about the right of Schwartz & Freeman (or the plaintiff) to withdraw the money or the offer. Nor was there any suggestion that either or both were joined as offerors; on the contrary, the escrowees' letter specifically referred to the Banner Company and the Liebermans as making the offer.

It makes no difference that, as plaintiff urges, the defendant may have had sufficient actual notice in this particular case to enable it to determine the true ownership of the deposited funds, and thus to allow withdrawal by the owner. Under the regulation, as we read it, that was not the Service's obligation. It had no responsibility to delve into the underlying arrangements or to evaluate the true ownership of the funds transmitted with the compromise offer. Since it was clear on the face of the offer that plaintiff and the escrow agents were not offerors, they were likewise not "proponents" under the regulation and could not themselves withdraw the money "at any time prior to its acceptance."[9]

A fortiori, Section 7809 of the Code does not aid plaintiff and the escrowees. That provision declares that, upon "*rejection*" of a compromise offer by the Government, "the Secretary or his delegate shall refund to the *maker of such offer* the amount thereof" (emphasis added). This declaration is unavailing for two reasons. It deals only with the rejection of an offer, not with withdrawal prior to action by the Service. There was in this case no rejection by the Service; the offers, as revised, were accepted, belatedly, in 1962.[10] Also, the

---

8. In Dynamic Service, Inc. v. Granquist, 51 A.F.T.R. 1419, 56–2 U.S.T.C. par. 9784 (D.Ore., 1956), a cause similar to the one at bar, plaintiff tendered $1,000 to the Internal Revenue Service as part of a compromise offer submitted by a taxpayer whose business it was purchasing. The check and offer were later returned to the taxpayer because they did not fully comply with the regulations. After the offer was revised and resubmitted by the taxpayer, plaintiff made a request for return of the $1,000, and the Internal Revenue Service refused. The court dismissed plaintiff's suit against the District Director of Internal Revenue on the ground that it did not have standing to sue since "the $1,000.00 check tendered with the offer in compromise was a payment made by the taxpayer and the $1,000.00 in dispute was for purposes of this case taxpayer's money."

9. We do not find any adequate basis in the record for determining that the Internal Revenue Service in fact recognized plaintiff or the escrow agents as "proponents."

Service personnel conferred with plaintiff and possibly the escrow agents, at some time or times, in the period between the making of the offer in 1951 and the attempted withdrawal by the agents in 1959. But we cannot infer from the bare fact of such consultations that the Government accepted plaintiff or the agents as proponents, or even that it recognized them as the true owner of the funds.

10. Plaintiff claims that the Service rejected the offer when it required the taxpayers, for formal reasons, to file separate offers on behalf of each taxpaying group in place of a lump sum offer on behalf of all. This was not a rejection but merely advice to the taxpayers to perfect their submission in order to prevent a rejection. Nor was there a rejection of the initial offer, or a return of the funds to the taxpayers contrary to the terms of the offer, in the technical mechanics by which the original $50,000 was applied to the revised offers. See findings 22–23. The escrow agents had previously authorized the $50,000 to be

statute specifically designates an offeror as the recipient of the refund, not someone who may have supplied the funds but is not an offeror.

▪ The plaintiff and the intervenors are likewise unable to recover on the basis of a contract implied in fact with the United States. Assuming that such a contract came into being when the Government accepted the money, there has been no breach. In the letter accompanying the funds, the plaintiff, through its escrowees, stipulated that, if the compromise offer were accepted, the defendant was entitled to retain the money; and that, if rejected, the funds were to be returned to the escrow agents. No other conditions were stated and no other relevant condition can be implied. Since the defendant never rejected the compromise offer and it was subsequently accepted, the only pre-conditions to the Government's right to the funds under the implied contract have in fact been met. No breach occurred.[11] We also hold that, if such an implied contract was made, it was adequately supported by consideration; in return for the deposit, the Government agreed to consider the taxpayers' offer. But if there was no consideration, as plaintiff now says, then there was no implied agreement upon which recovery could be premised.

▪ Plaintiff, which obviously feels that it has paid out $50,000 to benefit others but without any advantage to itself, may have a cause of action against the taxpayers (or someone else) for unjust enrichment, breach of contract, or breach of trust. But it has no claim against the defendant. The United States did not violate any pertinent statute or regulation, and it did not break any agreement with or on behalf of plaintiff (or the escrowees). The money which the Internal Revenue Service took was voluntarily proffered in satisfaction of tax liabilities admittedly owing to the United States; and the Service complied with the only conditions imposed by the compromise-offerors or by the plaintiff's own escrow agents. No rightful expectation of plaintiff's was frustrated by the Service's actions. In sum, the Government has not acted improperly and it has not been unjustly enriched.[12]

The plaintiff and the intervening escrow agents are not entitled to recover. The petition and the intervening petition are dismissed.

---

applied to the separate offer; plaintiff, too, must be held to have consented, either actually or constructively. See findings 19–20.

11. The Government did not injure plaintiff in acting on the offer in 1962. The time limit on the use of the fund had been specifically removed in 1953. In June 1957 the plaintiff and the escrowees had consented to the use of the same $50,000 in connection with the revised separate offers. By that time the money had been on deposit for almost six years, without any complaint by or on behalf of plaintiff. The money was first applied to the new offers in October 1958. The escrowees' demand on defendant came shortly thereafter in January 1959; that was the first indication of dissatisfaction by or on behalf of plaintiff. After the escrowees' demand in January 1959, there was a dispute as to their entitlement to the money. Suit here was brought on April 1, 1959. In those circumstances, the delay in action by the Service from January 1959 until July 1962 was not detrimental to plaintiff or the escrow agents.

12. For these reasons, if we were also to uphold our jurisdiction under the fourth head of jurisdiction proposed by plaintiff—the clause of 28 U.S.C. § 1491 which gives this court power to decide claims "for liquidated or unliquidated damages in cases not sounding in tort"—there could still be no recovery. If, as we hold, the causes of action based on the Code, the regulation, and implied contract have no merit, we know of no other basis for saying that the plaintiff (or the escrowees) should recover from the United States. The Internal Revenue Service did not act illegally, improperly, or unreasonably; the money was paid over voluntarily under conditions, set by plaintiff and its agents, which have been fully met; the money satisfied a debt due the Federal Government; and the United States has not been unjustly enriched.