James S. GARVEY, Appellant,

v.

Orville L. FREEMAN, Secretary of Agriculture of the United States, W. Harold Tuttle, F. H. Hallock and Charles E. Buck, in their capacities as members of the Kiowa County, Colorado Agricultural Stabilization and Conservation Committee: Arthur Isgar, Charles Hanavan, Jr., and Dewey Carnahan, in their capacities as members of the Agricultural Stabilization and Conservation Committee of the State of Colorado, Appellees.

Nos. 9623, 9626.

United States Court of Appeals Tenth Circuit.

June 28, 1968.

of wheat marketing certificates upon which subsidies were paid under the 1964 voluntary wheat marketing certificate program. 78 Stat. 173, 178 amending the 1938 Agricultural Adjustment Act, 52 Stat. 31, 7 U.S.C. § 1281 et seq. The serious contention is that the applicable administrative procedures for the determinations were perverted by the departmental officials to deny Garvey the rudiments of a fair hearing on his right to participate ratably in the wheat marketing certificate program. He seeks judicial review of the administrative orders and an appropriate decree insuring due process.[1]

From the very outset the Government has challenged the jurisdiction of the court to review the administrative orders asserting that since the 1964 amendment did not expressly provide for judicial review and since factual determinations were made "final and conclusive" by applicable provisions of the basic act, judicial review is effectively precluded. The trial court was satisfied that by electing to participate in the voluntary program Garvey acquired the right to procedural due process of which the court could take judicial cognizance in accordance with the rule in Stark v. Wickard, 321 U.S. 288, 309, 64 S.Ct. 559, 88 L.Ed. 733, and that the departmental officials could not assert governmental immunity against a claim that they acted in excess of their authority to deprive Garvey of a fair hearing, citing Pan American Petroleum Corp. v. Pierson, 284 F.2d 649 (10 Cir.) Upon reviewing the record of the administrative proceedings and affidavits supporting the motion for summary judgment, the court was of the view that the administrative determinations of the critical normal farm yield were not arbitrary or capricious or the result of bias or preju-

James L. White, Denver, Colo. (Dwight K. Shellman, Jr., William J. Carney, Jr., Denver, Colo., on brief) for appellant.

Robert V. Zener, Washington, D. C. (Edwin L. Weisl, Jr., New York City, Lawrence M. Henry, Denver, Colo., Alan S. Rosenthal, Washington, D. C., on brief) for appellees.

Before MURRAH, Chief Judge, HILL, Circuit Judge, and CHRISTENSEN, District Judge.

MURRAH, Chief Judge.

Garvey appeals from a summary judgment affirming an administrative determination of the normal per acre wheat yield for the 1965 crop year for five of his Colorado farms; such determinations formed the basis for the issuance

1. Garvey also appeals the trial court's contemporaneous dismissal of his suit for injunctive relief in No. 9626; he had asked there that the District Court enjoin the issuance of any wheat certificates in Kiowa County, Colorado, for certain later crop years until due process has been insured on judicial review of the challenged orders. 263 F. Supp. 579. That suit, while technically before us on dismissal for failure to exhaust administrative remedies, is effectively disposed of by our treatment of the due process issues in this appeal.

dice; that Garvey had been accorded the fundamentals of due process; and that the orders were supported by the record. Summary judgment was entered. 263 F.Supp. 573, 579. We affirm.

The voluntary wheat certificate program involved here was enacted in 1964 after wheat farmers rejected the 1962 mandatory program, 76 Stat. 605, in a national referendum. The voluntary program required compliance only by those who elected to participate, whereas the antecedent mandatory program established certain "marketing quotas" for all farmers and penalties for failure to abide by them. Both programs were enacted by amendments to the Agricultural Adjustment Act of 1938, supra, which provides the statutory framework for various subsidy programs—both mandatory and non-mandatory.

With respect to wheat programs, the basic act provided that in determining the normal crop yield certain adjustments would be made to the average actual yield for the preceding five years. If data on actual yield was not available, the normal yield would then be determined by appraisal in accordance with the regulations of the Secretary of Agriculture, "taking into consideration abnormal weather conditions, trends in yields, the normal yield for the county, the yields obtained on adjacent farms during such year and the yield in years for which data are available." 7 U.S.C. § 1301 (b) (13) (E). The Secretary was required by statute to utilize the Community, County and State Committees elected by and from participants in the program.[2] 7 U.S.C. § 1388, 16 U.S. C. § 590h(b), and the implementing regulations necessarily required the County Committee to determine normal yields either by actual yield or appraisals. The regulations made no provision for a

hearing on the initial determinations based on the Community Committee appraisals but did expressly provide for a reconsideration and informal hearing on any initial determination by the County Committee, 7 C.F.R. 780.3, and an appeal to and informal hearing by the State Committee, 7 C.F.R. 780.4 and by the Deputy Administrator—a departmental officer, 7 C.F.R. 780.5. The regulations also undertook to define the nature of the "informal hearing" which was to occur at all levels and provided for a "full opportunity [to the aggrieved farmer] to present [relevant] facts and evidence"; for the right of cross-examination of "persons other than those appearing in behalf of [the farmer]"; and for the preparation by the reviewing authority of a written record of the findings. 7 C.F.R. 780.8. The reviewing authority was authorized by the regulations to "develop additional evidence from other sources [prior to making its determination]". 7 C.F.R. 780.9. Final determinations of the Deputy Administrator were unappealable, i. e., appeal to the Deputy Administrator was the final step in the administrative hierarchy.

The original act provided that "The facts constituting the basis for any payment * * * when officially determined in conformity with the applicable regulations * * * shall be final." 7 U.S.C. § 1385. But, specific provision was made in the basic act for judicial review of administrative determinations of "marketing quotas", 7 U.S.C. §§ 1363, 1365–1368. It seems to be conceded, however, that the specific provision for review is inapplicable to the determination of "normal crop yield" involved here simply because the 1964 voluntary program was not concerned with mandatory marketing quotas, but rather with

**2.** The system of local committees composed of participants in the program originates in the Soil Conservation and Domestic Allotment Act of 1935 and was by reference incorporated and made a part of the Agricultural Adjustment Act of 1938. 7 U.S.C. § 1388. The incorporated section, 16 U.S.C. § 590h(b) provided specifically that, "The secretary is directed to utilize the services of local and state committee [elected by and from farmers] within any * * * local administrative area and participating or cooperating in programs."

determinations of normal crop yield as the basis for the payment of subsidies.

■ The Secretary would have us hold that the absence of any provision for judicial review in the voluntary program, coupled with the finality provision of the basic law, indicate a congressional intent to preclude all judicial review of administrative determinations in cases like ours. Heavy reliance is placed on Caulfield v. U. S. Dept. of Agriculture, 293 F.2d 217 (5th Cir.), and Mario Mercado E Hijos v. Benson, 97 U.S.App.D.C. 298, 231 F.2d 251. We find no implication of congressional intent to preclude review in either the finality provision or the failure of Congress to carry forward the explicit provision for judicial review applicable to the mandatory programs.

■ Courts show "great deference to the interpretation given [a] statute by the officers or agency charged with its administration." Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L. Ed.2d 616; Gardner v. Brian, 369 F.2d 443 (10 Cir.). But failure to expressly provide for judicial review of administrative determinations raises no presumption that none was intended or authorized. "When Congress passes an Act empowering administrative agencies to carry on governmental activities, the power of those agencies is circumscribed by the authority granted. * * * The responsibility of determining the limits of statutory grants of authority in such instances is a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction." Stark v. Wickard, supra, 321 U.S. 309, 310, 64 S.Ct. 571. Surely the Secretary does not mean to contend that Congress intended to preclude judicial review of this claim of denial of procedural due process upon which the agency action was made to rest. And, if Judge Brown, speaking for the majority in Caulfield, supra, means to say that the failure of Congress to specify the right of judicial review frees administrative action of any

judicial scrutiny for the claimed denial of due process of law, we must disagree with the majority for reasons stated by Judge Wisdom in dissent: "No legislative language can deprive a man of a fair hearing in the adjudication of his rights, or of his right to have a court decide whether the administrative agency acted within its jurisdiction; and, whether the agency through a lay tribunal applied the correct rule of law to the facts." Id. at 228. And see comment in footnote 22, Id., citing Jaffe, The Right to Judicial Review, 71 Harv.L.Rev. 401 (1958).

■ It must be obvious that the so-called finality provision making findings of fact "final and conclusive when made in conformity with the regulations" does not preclude judicial review of the question whether the findings of fact were in conformity with the regulations. This is a question of law reviewable under the Administrative Procedure Act, 5 U.S.C. § 704. Aycock-Lindsey Corp. v. United States, 171 F.2d 518 (5 Cir.), where only the finality of findings of fact was involved, is not contra. Nor is United States v. Kopf, 379 F.2d 8, which involved finality of payments made by the Secretary based on determinations of average per acre yield. The Eighth Circuit held that these payments and the supportive determinations were final under 7 U.S.C. § 1385, and that the Secretary was not authorized in these circumstances to alter or set aside these payments once made.

The regulations providing the procedural hierarchy for hearings and appeals were undoubtedly designed to insure due process in the ultimate factual determinations. Whether the proceedings in this case measure up to the minimum standards for a fair hearing—the overriding concern of due process—is the question for the court to decide here.

■■ Garvey seems to argue that the administrative procedures were inherently bad because the normal crop yield was determined by County Committeemen on the basis of appraisals by the

Community Committeemen, all of whom had a direct interest in the determination of the number of wheat certificates to be allocated to Garvey from the total allocated to all farms in the county. This procedure is said to be violative of the basic concept of due process that no one shall be a judge in his own case. The short answer is that when Garvey elected to join the program, he embraced the existing procedures by which his rights to participate in the program would be determined. The more complete answer is found in the language of Judge Brown in Caulfield v. U. S. Dept. of Agriculture, supra: "Whatever might be thought to be the shortcomings of the informal tribunals of County and State committees made up as they would be by persons having evident self-interests, Congress purposely undertook to lodge immediate responsibility in these neighborhood tribunals. Nearness to the problem and to the people affected—or afflicted—by adjudications having decisive consequences may well have been to Congress the assurance of impartiality. * * * Congress presumably put its faith in the localized and immediate responsibility of these groups as their decisions had to pass muster in the particular community." 293 F.2d at 221. Even though the regulations contemplated procedural informality, they necessarily contemplated a fair hearing whether conducted under the shade of a tree or within the marbled halls of a courthouse. "When the Constitution requires a hearing, it requires a fair one before a tribunal which meets at least currently prevailing standards of impartiality." Wong Yang Sung v. McGrath, 339 U.S. 33, 50, 70 S.Ct. 445, 94 L.Ed. 616. And see Hornsby v. Allen, 326 F. 2d 605 (5 Cir.) and authorities cited there. This brings us face to face with Garvey's contention that the procedures prescribed for a fair hearing were abused to deny him due process of law. Garvey alleges that the administrative determinations rest on a continuing series of hearings of which he had no notice or knowledge and at which secret evidence adverse to him was presented and considered. These hearings and the extrinsic evidence are said to violate the Administrative Procedure Act as well as due process of law.

A review of the factual background will be helpful to an understanding of the nature and significance of the occurrences of which Garvey complains. For the purpose of determining the total number of certificates to be allocated to Kiowa County for 1965, the Secretary had determined the normal per acre yield at 19.5 bushels—one less than the 20.5 determination for 1964. 7 C.F.R. 728.8(d), 728.208. The 1964 appraised normal yield for the five Garvey farms involved here was 18.6 bushels per acre. We are concerned with the 1965 yield which the County Committee, concurring in the Community Committeemen's appraisal, lowered to 18 on four of the farms and 17 on the fifth. According to computations of a Garvey representative this resulted in a 1965 average normal yield for his farms of 17.26 bushels per acre, which is said to be approximately three bushels less than the average for all relevant farms in the county.

Garvey requested a redetermination by the County Committee and asked for an increase to 20 bushels on the ground that the appraisal was inequitable in comparison to the determinations for other similar farms. He made no request for a hearing, and his request for redetermination was considered at a regular meeting of the County Committee. The minutes of that meeting disclose that the appeal was disapproved after discussion indicating that the Community Committeemen thought Garvey's farming methods produced less wheat than nearby farms, that the "ownership basis" and "large area owned" made production hard to evaluate, and that, moreover, the county reserve for appeals was inadequate to fulfill the demands of all the Garvey appeals. Significantly, the letters to Garvey announcing the decisions mentioned only the latter reason. Garvey appealed and requested a hearing before the State Committee on the

stated grounds that the determinations were not in accordance with the regulations. He repeated his request for an increase in the normal per acre yield to 20 bushels for each of his farms.

Preliminary to the hearing of Garvey's appeal, the State Committee requested from the County Committee certain items mentioned in pertinent parts of the departmental appeals handbook "and a chronological narrative outlining all actions taken by [the County] office on this matter." The County Committee responded by submitting a two-part memorandum consisting of a copy of the minutes of the meeting at which the redetermination was considered and a chronological narrative statement of the Committee's previous dealings with the Garvey farms. Importantly, the memorandum to the State Committee contained reasons not disclosed to Garvey for the lowering of the appraised yield, including the claim of inferior farming methods supported by a strong statement of complaints of dust from Garvey's land blowing on adjoining land. Garvey did not receive a copy of the memorandum until his later appeal to the Deputy Administrator, although he specifically asked that the report be entered in the record of the state hearing. The report containing the memorandum is the first instance of "secret evidence" claimed by Garvey.

The second instance of claimed "secret evidence" is reflected in the minutes of the regular meeting of the County Committee at which the "Farmer-Fieldman" (a representative of the State Committee) asked to be briefed on "yields and other pertinent information [from] the County * * * and Community Committeemen * * * that would be helpful in the case of a [State] hearing [on Garvey's appeals]." The minutes of this County Committee meeting contain the most complete statement of Garvey's alleged inferior farming methods available in the record: "The land [varies] from very poor to very good. All of the Committeemen present made it clear that they, or their neighbors, have problems with the Garvey farms because of the blowing over on them, part of which they attributed to the fact that the farms are so large it is impossible for the management company who operates this farm to work the land when it needs to be worked. All were in agreement that, even though some improvement has been made in their operation, it is still a far cry from being classified as good farming or the type of farming that the average farmer on the average family-sized farm would have to carry out in order to get the most production from the land."[3] The Government seems to admit that these minutes of the County meeting were neither offered to Garvey during the administrative appeal nor made part of the administrative record certified by the Secretary to the district court on judicial review.

The State Committee hearing was held in Denver. Except for a statement by a "program specialist for A.S.C.S." which does not appear in the record on appeal, the evidence was apparently presented entirely by Garvey representatives, one an attorney and one a farm manager. In attendance, however, and apparently given relatively free reign to speak, were members of the County Committee and the office manager for the County. The meeting seems to have consisted of the presentation of Garvey's evidence interspersed with questions and comments from those in attendance and, on some occasions, questions from Garvey's attorney to those persons offering

---

3. The minutes of the meeting also reflect that the farmer-fieldman suggested that the members of the County Committee arrive early at the hearing "to meet with the State Committee before the hearing is called". Garvey says that such a meeting would have been another example of secret evidence. There is, however, nothing further in the record to indicate whether such a meeting actually occurred.

comments.[4] Garvey's farm manager claimed that other similar farms, particularly those of the Community and County Committeemen had higher appraised normal yields; he also described in detail the Garvey farming methods and defended them, particularly against the claim of blowing dust. Finally, Garvey's attorney suggested that, since "all the committee is getting now is two adverse opinions", they should visit the farms in person. He also asked that the memorandum from the County Committee be "turn[ed] over to the reporter for evidence in the transcript". The "Program Specialist" replied, "No, they are confidential as far as your people are concerned. This is nothing more than a 'summary of the facts' and that's all it is."

Members of the State Committee toured the Garvey farms twice after the hearing accompanied by County Committeemen and Garvey representatives. The committee then affirmed the County Committee appraisals stating that after making the inspection tours, it had determined that the yields correctly reflected Garvey's productivity "in relation to yields established for other similar farms."

In his appeal to the Deputy Administrator Garvey alleged that the committees had discriminated against him on the pretext that his farming methods were not adequate and claimed that the normal yields for his farms were not established in accordance with the regulations in that they did not properly reflect his productivity in comparison to similar farms. The minutes of the hearing in Washington disclose that it consisted primarily of a presentation by Garvey personnel with occasional questioning by the Deputy Administrator and other representatives of the Department of Agriculture. In his introductory remarks the Deputy Administrator stated, "We do not reach a decision here today. We will consider the record created, all of the facts that you give us, along with those assembled from the earlier hearings at the county and state level and we will go back to those offices for additional information, if necessary, depending on what may be brought out in this hearing." Garvey representatives repeated their previous contentions with regard to the dust situation, the efficiency of their farming methods, and their appraised normal yield in relation to other farms in the county. They also strongly suggested a lack of good faith on the part of the state committeemen making the inspection tour—that they "just couldn't bother to observe land which was being pointed out to them for the purpose of comparison". At this hearing the memorandum from the County Committee to the State Committee was made available to Garvey for the first time.

A representative from Washington was apparently sent to Colorado for the purpose of interviewing the committeemen concerning the charges leveled against the appraisals of Garvey's yield. As a result, a "special session" of the County Committee, attended by a State Committeeman, was devoted entirely to a discussion of the Garvey appeal. The minutes of the meeting reflect a point-by-point discussion of the matters raised at the Deputy Administrator's hearing. The committeemen repeated their disagreement with positions taken by Garvey and their reasons for considering his farming methods inferior and his normal yield determinations "fair and equitable". The group reviewed the yield records to determine whether committeemen had received abnormally high yields. Further, the "state committeeman took notes in order to report to a later meeting of the state committee with a representative from Washington." From the introductory statement of the Deputy Administrator at the Washing-

---

4. Identification of those making comments is difficult since the reporter hired by Garvey became confused and was able to refer to a number of the participants only as "voice"; the office manager is, however, identified by name and does speak often for the Committee.

ton hearing and the minutes of this meeting, we may safely infer that it was held to afford the County Committee an opportunity to rebut the Garvey charges at that hearing. It is also apparent that the information reflected in these minutes, as well as information from the State Committee, was intended to be submitted (probably in the form of a report) to the Deputy Administrator to be considered in his final decision on appeal. These minutes are said to be reflective of another instance of "secret evidence" on which the ultimate decision of the Deputy Administrator was made to rest. It is conceded that these minutes, like those of the meeting between the farmer-fieldman and the County Committee, were not given to Garvey until after the Administrator's decision.

Affirming the County Committee's appraisal of Garvey's yield "since they represent judgments based on local knowledge", the Deputy Administrator noted "sincere but conflicting opinion about farming methods, availability of equipment and the effect of wind erosion on yields on all Kiowa County farms". He rejected the claim of bias or discrimination finding a "reasonable spread of yields" in the county (267 farms with yields below 17 bushels; 55 with yields above 18) and that this "and other factors" indicated a reasonable judgment by the County Committee on comparative productivity.

In response to Garvey's charges, on judicial review the Secretary filed his answer and moved for summary judgment on the tendered administrative record and affidavits by the Deputy Administrator and two State Committeemen. The administrative record consisted of the transcript of the informal hearings before the State Committee and the Deputy Administrator and the pertinent correspondence between Garvey and the committees and the Deputy Administrator. It did not contain the memorandum from the County Committee to the State Committee (a copy of which had been delivered to Garvey at the Deputy Administrator's hearing); neither did it contain the minutes of the meeting of the County Committee with the farmer-fieldman nor the minutes of the special session of the County Committee with the State Committeeman, all of which Garvey contends were reflective of secret evidence which actually formed the basis for the administrative determinations.

The affidavit of the Deputy Administrator summarized the statutory background of the program and the administrative record as certified by the Secretary. Additionally, it went on to recite that the "County Committee was of the opinion that the farming methods employed [by Garvey] were inferior to those used on the average farms in the county," and that his productivity and consequent normal yield was lower than average.

The affidavit of the State Committee Chairman told of the State Committee hearing on appeal and two inspection tours of the farms. The affiant then proceeded to describe the Garvey farming operations "based upon the above hearing and these tours." He described the size of the farms and the management system, stating specifically that there was "one operative tractor per 4,000 acres" and that "[m]uch of the land is farmed in three mile strips which cut across various farm boundaries." He noted the use of "one-way plows" and "semi-furrow disc drills" (apparently inferior equipment) and the failure to use "stubble mulch, rod weeders, sweep machines [or] hoe-type drills". He went on to state that "Due to the size of the Garvey operations and the location of their equipment [Garvey] is unable to till all of [his] land at the optimum time [although] timeliness in the tilling of land is one of the important factors in successful farming in southeastern Colorado", and furthermore that "visual observation" on the inspection tours showed that the strip cropping operations resulted in some blown dirt being retained on the Garvey land but that "this has created dirt hummocks and dirt fills to the extent that

farming of many of these strips has apparently been abandoned for several years." Finally, he observed that the County Committee had "considered the above farming situation in comparing [Garvey's] productivity * * * with those of surrounding farms as part of the appraisal of the normal yields."

The affidavit of the second State Committeeman was an almost verbatim repetition of the first with two important substantive additions. This Committeeman stated, "[B]ecause the farms are operated as one unit, they do not receive the individual attention usually accorded to smaller farms in order to take advantage of varying weather conditions, rains, differences in the soil and other factors. The lack of sufficient help at the right time also prevents taking advantage of some of these factors which have a bearing on the productivity of the land."

Garvey moved to strike all three affidavits as dehors the administrative record to which judicial review must be confined. There is nothing in the record to indicate the disposition of the motion, but it seems to be conceded that the affidavits were not stricken.

Garvey's persistence resulted in addition of the memorandum from the County Committee to the State Committee to the administrative record. Approximately a month before oral arguments on the motion for summary judgment, Regional Counsel for the Department announced by letter that "all minutes of regular sessions of the County Committee may be made available for examination by Mr. Garvey or his agent." Garvey admits that he then received minutes of all relevant sessions of the County Committee but did not examine them in the three weeks before oral argument.

After oral argument, the Secretary filed a memorandum "Demonstrating that Several Producing Wheat Farms had 1965 Normal Yields Lower Than [Garvey's]". This memorandum was apparently intended to correct the data on which the Deputy Administrator based his decisional finding of "reasonable spread of yields" to now state that, of 267 farms with yields lower than 17 bushels, only seven were eligible to participate in the program. The net effect of this was to concede that of comparable farms seven had yields below Garvey's farms, fifty-five above.

After summary judgment, Garvey, having examined the minutes received before oral argument, made pertinent items discovered therein the basis for his motion for new trial, including the minutes of the County Committee meeting with the farmer-fieldman and the minutes of the "special session" of the County Committee with the State Committeeman. The motion was denied.

▮▮▮▮▮ Garvey now says that the minutes and the supportive affidavits disclosed new facts dehors the administrative record; that they are an implied recognition of procedural and factual deficiencies in the administrative process which cannot be supplied on judicial review. The Secretary's footnote answer is that since factual determinations are not open to judicial inquiry, the affidavit facts are, in any event, merely superfluous. But, we cannot dispose of the charge with such facility. Discrepancies between the administrative record facts and the affidavit addenda on judicial review, if indeed there be such, may very well support the contention that the administrative determinations were not made in conformity with the regulations erected for the purpose of insuring due process. Moreover, factual determinations are not final and conclusive unless relevantly supported by the record—an administrative order without factual support is without due process. See Justice Brandeis concurring in St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 74, 56 S.Ct. 720, 80 L.Ed. 1033; Tagg Bros. & Moorhead v. United States, 280 U.S. 420, 50 S.Ct. 220, 74 L. Ed. 524. This is not a de novo review. The integrity of the administrative process must be judged by what took place in the administrative proceedings

as reflected on the administrative record unaided by affidavit proof in the reviewing court. See Tagg Bros. & Moorhead v. United States, supra; United States v. Carlo Bianchi & Co., 373 U.S. 709, 715, 83 S.Ct. 1409, 10 L.Ed.2d 652; National Broadcasting Co. v. United States, 319 U.S. 190, 227, 63 S.Ct. 997, 87 L.Ed. 1344; Acker v. United States, 298 U.S. 426, 56 S.Ct. 824, 80 L.Ed. 1257; Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 54 S.Ct. 692, 78 L.Ed. 1260. Administrative due process must be found in the administrative record.

▇▇▇ The trial judge decided the procedural due process issue upon "the entire record, including the transcripts of the hearings before the State Committee and the Deputy Administrator * * *". Garvey v. Freeman, 263 F.Supp. 573, 578. But, a comparison of the factual contents of the administrative record with the affidavit facts does not reveal any substantial discrepancies or variances. Both set forth in detail the basic facts of the controversy. The transcript of the hearing before the State Committee discloses that the admitted differences between the farming methods employed by Garvey and those of the smaller farmers actuated the County Committee to conclude that Garvey's methods were inferior with consequent lower normal per acre crop yields. True, the affidavits for the first time described in detail the observations of the State Committeemen on the inspection tours and the reasons for their concurrence in the County Committee's appraisals. But, the inspection tours were conducted in the presence of Garvey's representatives, and it is not fatal to due process that the State Committeemen failed to set forth with particularity the reasons for their concurrence in the County Committee appraisals. Though the affidavits were argumentative summarizations which tended to amplify the administrative proceedings, they added nothing materially new or different to the administrative record. In any event, it was not prejudicial to refuse to strike them from the review record.

▪▇▇▇ The Administrative Procedure Act was invoked for the first time on judicial review. The contention seems to be that although no relevant part of the Agricultural Adjustment Act requires "adjudication [thereunder] * * * to be determined on the record after opportunity for an agency hearing" within the meaning of the Administrative Procedure Act, i. e. see 5 U.S. C. § 554, the latter Act nonetheless is made applicable in our case by compulsion of due process, i. e. see Wong Yang Sung v. McGrath, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616; and that the hearings pursuant to which the determinations were made were not in compliance with the procedural standards prescribed by the Act.[5] We need not decide whether the Administrative Procedure Act is applicable at any stage of the de novo administrative proceedings, for in any event, compliance is not prerequisite to the exercise of agency authority and is waived by failure to invoke it at the administrative level. See United States v. L. A. Tucker Truck Lines, 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54; United States v. Elof Hansson, Inc., 296 F.2d 779, 48 CCPA 91. We think it was clearly waived in this case. At no stage of the administrative proceedings was it suggested that the Administrative Procedure Act hearing is required either by statute or by due process. Garvey knew, through his attorney, that the applicable regulations provided for an informal de novo hearing before the State Committee to review the County Committee de-

---

5. Cf. Gardner v. United States, 239 F.2d 234 (5 Cir.), wherein Judge Hutcheson, dealing with the mandatory provisions of the Agricultural Adjustment Act, i. e. see 7 U.S.C. §§ 1357–1359, apparently assumed the applicability of the Administrative Procedure Act to administrative determinations but concluded that full administrative due process was afforded in the de novo proceedings on judicial review. And see Webster Groves Trust Co. v. Saxon, 370 F.2d 381 (8 Cir.).

terminations and an informal de novo hearing before the Deputy Administrator to review the State Committee determinations. He appeared before both the State Committee and the Deputy Administrator with counsel and presented his case without objecting to these informal procedures or suggesting that the Administrative Procedure Act was applicable to require more formal proceedings. He must, therefore, rest his case on the original proposition that the "informal hearings" prescribed by the regulations to insure due process were perverted to deny it.

In determining this question we must bear in mind that "due process is not necessarily judicial due process". See Brandeis concurring in St. Joseph Stock Yards Co. v. United States, supra, 298 U.S. 77, 56 S.Ct. 720. Due process is elusive, undefinable, and varies to embody the "differing rules of fair play, which through the years have become associated with differing types of proceedings." Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 1515, 4 L.Ed.2d 1307; and see Market Street R. Co. v. Railroad Comm'n, 324 U.S. 548, 562, 65 S.Ct. 770, 89 L.Ed. 1171. Indeed, administrative determinations are usually made in furtherance of a legislative scheme to achieve what has been legislatively determined to be socially desirable, and they are often more legislative in nature than judicial, i. e., see Opp Cotton Mills v. Administrator, 312 U.S. 126, 61 S.Ct. 524, 85 L.Ed. 624. And, so it is in our case. These farmer-commissioners do not sit as a judicial or even a quasi-judicial tribunal where witnesses are sworn and evidence taken. They sit informally to appraise and assess relative rights of their neighbors and themselves in the administration of a program by and for farmers. Their judgment in the first instance is essentially based upon observations and considerations within their peculiar knowledge unaided and unimpeded by traditional notions of evidence. Rules of procedure and evidence are inapplicable and inappropriate. But, the "basic concepts of fair play" are "inexorable safeguards" for due process. See Morgan v. United States, 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129. This means that what was said and done in these informal proceedings affecting Garvey's rights must have been done in an open forum with notice and an opportunity for the traditional right of confrontation and cross-examination. Ibid., and Cf. Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L. Ed.2d 1377. In this context we look to the administrative record to determine whether what was said and done in the informal hearings at any stage of the de novo proceedings conformed with the basic concepts of fair play, i. e., a full, albeit informal, discussion of the pertinent issues with the right of confrontation and cross-examination, i. e., see Opp Cotton Mills v. Admr., supra, 312 U.S. 126, 61 S.Ct. 524.

The record of the State Meeting discloses that Garvey was present with his lawyer and farm-manager. It does not reveal the names of the County or State Committeemen who were present at the meeting, but it does indicate, and no one denies, that members of both Committees were present, participated in the discussion and were cross-examined by Garvey's attorney. In any event, the record discloses a lively, free and open discussion of the conditions and considerations which prompted the County Committeemen to appraise Garvey's normal crop yield lower than the county average. And, if there was any lack of free and open discussion with the right of confrontation and cross-examination at the State Meeting, the record which Garvey made and brought here does not disclose it. It may well be that the County Committeemen and even the State Committeemen harbored a small farmer's prejudice against a big farmer and that this was reflected in their ultimate decisions. But, we cannot subjectively judge the minds of these committeemen or impugn their good intentions, especially in the face of a finding by the Deputy Administrator and the District Judge that there was no prejudice. We

must conclude that the record of the proceedings at the state level conforms to the minimum standards of due process as contemplated by the regulations, unless, as Garvey contends, the determinations of the Committeemen and the Administrator were not based upon the open hearings reflected in the administrative record, but rather were actuated by and made to rest upon evidence or information of which Garvey had no notice or knowledge and no opportunity to question in an open forum. This brings us squarely to the three instances of so-called "secret evidence".

 The first instance was the memorandum from the County Committee to the State Committee which was withheld from Garvey until the Deputy Administrator's hearing. This memorandum undoubtedly contained information to which Garvey was entitled. But, it reflected nothing which was not fully and openly discussed at the state meeting. The same may be said of the second instance of so-called "secret evidence" as reflected by the minutes of the regular meeting of the County Committee with the Farmer-Fieldman. This was merely a reiteration of the County Committee's reasons for their determinations. There was no justification for withholding this information, and the Secretary, through counsel, now seems to agree that both the meeting and the minutes thereof should have been disclosed to Garvey. A fair hearing contemplates full disclosure, and secrecy generates suspicion and doubt. But, we cannot say that in these circumstances the failure to disclose worked a deprivation of due process.

 The third instance of "secret evidence" is the meeting of the State Committeeman with the County Committee pursuant to the hearing before the Deputy Administrator. Garvey was neither previously nor subsequently apprised of this meeting. Assuming that a report was made to the Administrator, it was not made available to Garvey, nor does the administrative record reflect it.

But, the minutes of the meeting, finally made available on judicial review, disclose no new facts, data or information. Rather, they reflect a repetition of what was contained in the memorandum and the open hearing before the State Committee. Moreover, as we have seen, the Administrator announced at the outset of his hearing that an investigation of Garvey's charges would probably be conducted at the County and State levels on the basis of which he would review and act upon the determinations of the County and State Committees. Garvey made no objection to this procedure. This is not a situation akin to the cases involving ex parte investigatorial accumulations of evidence on the basis of which affected parties suffer defamation of character, or their right to hold a job or pursue a calling is infringed or jeopardized without the right of confrontation and cross-examination as in Greene v. McElroy, 360 U.S. 474, 79 S. Ct. 1400, 3 L.Ed.2d 1377; Willner v. Committee on Character, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224; Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817; United States v. Nugent, 346 U.S. 1, 73 S.Ct. 991, 97 L.Ed. 1417. This practice does indeed tread on tenuous ground, but inasmuch as nothing new or prejudicial is reflected in the minutes, we cannot say they were "secret evidence" which prejudicially affected Garvey's rights.

We agree with the trial court that Garvey had ample opportunity to present his evidence and contentions and that he had a fair and adequate hearing which complied with the requirements of procedural due process.

 It is true that the Administrator's findings were based in part on erroneous data pertaining to the spread of yield. Yet, we must agree with the trial court that the evidence was sufficient to sustain the administrative appraisal of Garvey's normal yield and that the determinations, based as they were upon inspections and local knowledge, were

not arbitrary or capricious or the result of bias or prejudice.

The judgment is affirmed.

We also affirm the judgment in No. 9626 for the reasons stated in the trial court's opinion reported at 263 F.Supp. 579, and for the reasons stated herein.