Fred L. BOYD, Joe A. Davis, and D. Dean Boyd, Plaintiffs,

v.

The SECRETARY OF AGRICULTURE, Defendant.

Civ. A. No. 77–2338.

District Court of United States, D. South Carolina, Rock Hill Division.

Oct. 20, 1978.

Palmer Freeman, Jr., Fort Mill, S. C., for plaintiffs.

Lincoln C. Jenkins, III, Asst. U. S. Atty., and Thomas E. Lydon, Jr., U. S. Atty., D. South Carolina, Columbia, S. C., for the Secretary of Agriculture.

## ORDER ON DEFENDANT'S MOTION TO DISMISS

HEMPHILL, District Judge.

This matter comes before the court upon several motions[1] filed by defendant on April 21, 1978. Defendant alleges that the complaint fails to state a claim upon which relief can be granted, the court lacks jurisdiction over the subject matter of this action[2] and that there is no justiciable case or

---

1. These defenses were raised by way of Answer and a memorandum was subsequently filed, but the court is prepared, in its discretion, to rule upon them as if raised by motion.

2. Fed.R.Civ.P. 12(b).

controversy. All parties have filed memoranda rendering the issues raised ripe for decision.

This action was brought as a class action[3] by several farmers who have applied for and were subsequently denied disaster relief for the loss of their 1977 cotton crop due to drought damage under 7 U.S.C. § 1444(e)(2).[4] This statute provides for price support, loans, deficience payments, low yield and prevented planting disaster payments under the Upland Cotton Program.[5]

It is evident that a drought condition existed in South Carolina from early April to late May or early June, 1977. The Secretary of Agriculture (hereinafter "Secretary") established May 20, 1977 as the latest possible date for planting upland cotton in South Carolina. Scientists compute this date by taking variables of crop maturation time and probable time of the first frost. This enables them to determine the latest possible date for planting a successful crop. The planting period is defined in 7 C.F.R. § 718(b)(11).[6]

Since May 20 was established as the last date for planting a successful crop, claims for relief were to be filed after May 20. As the 21st and 22nd fall on the weekend, the first date that farmers could file was May 23, 1977. On May 23, 1977, approximately eighteen (18) to twenty (20) farmers including plaintiffs in Cherokee and York Counties, South Carolina, filed low yield disaster

---

**3.** Although this action is brought as a class action, no determination as to the existence of a class or certification of a class has been made at the date of this Order.

**4.** 7 U.S.C. § 1444(e)(2) provides: Price support, diversion, and cropland set-aside program for crops beginning with 1971 crop.

(2) Payments shall be made for each crop of cotton to the producers on each farm at a rate equal to the amount by which the higher of—

is less than the established price of 38 cents per pound in the case of the 1974 and 1975 crops, 38 cents per pound adjusted to reflect any change during the calendar year 1975 in the index of prices paid by farmers for production items, interest, taxes, and wage rates in the case of the 1976 crop, and the established price for the 1976 crop adjusted to reflect any change during the calendar year 1976 in such index in the case of the 1977 crop; *Provided,* That any increase that would otherwise be made in the established price to reflect a change in the index of prices paid by farmers shall be adjusted to reflect any change in (i) the national average yield per acre of cotton for the three calendar years preceding the year for which the determination is made, over (ii) the national average yield per acre of cotton for the three calendar years preceding the year previous to the one for which the determination is made. If the Secretary determines that the producers on a farm are prevented from planting any portion of the allotment to cotton because of drought, flood, or other natural disaster, or condition beyond the control of the producer, the rate of payment for such portion shall be the larger of (A) the foregoing rate, or (B) one-third of the established price. If the Secretary determines that, because of such a disaster or condition, the total quantity of cotton which the producers are able to harvest on any farm is less than 66⅔ percent of the farm base acreage allotment times the average yield established for the farm, the rate of payment for the deficiency in production below 100 percent shall be the larger of (A) the foregoing rate, or (B) one-third of the established price. The payment rate with respect to any producer who (i) is on a small farm (that is, a farm on which the base acreage allotment is ten acres or less, or on which the yield used in making payments times the farm base acreage allotment is five thousand pounds or less, and for which the base acreage allotment has not been reduced under section 1350(f) of this title, (ii) resides on such farm, and (iii) derives his principal income from cotton produced on such farm, shall be increased by 30 per centum; but, notwithstanding paragraph (3), such increase shall be made only with respect to his share of cotton actually harvested on such farm within the quantity specified in paragraph (3). . .

**5.** The regulations implementing the Cropland Cotton Program are found at 7 C.F.R. § 722.801 *et seq.* Section 722.809(h) provides as follows:

(h) Producers may qualify for disaster payments only when the county committee determines that prevented planting or a low yield as hereinafter described in this section occurs because of drought, flood or other natural disaster or because of a condition beyond the control of the producer. Disaster payments shall be made as soon as practicable after the disaster is reported, the extent of crop loss is determined, and payment is approved.

**6.** *Normal planting period.* That period as established by the State Committee, during which the crop is normally planted in the county, or area within the county, with the expectation of producing a crop.

claims. For relief to be granted, each farm must be inspected and a determination of eligibility made by the Secretary. It appears that the appraisals were commenced and completed in Cherokee County by May 27, 1977, and as a result, the producers in that county received low appraisals. This rendered them eligible for low yield disaster payments. However, in York County, appraisals were not commenced until June 2, 1977. They continued through June 9, 1977. During the latter part of May or early June, 1977 precipitation in the form of rain covered part of the cotton area of York County. By virtue of this precipitation some of the cotton germinated after the May 20th deadline. As a result of this germination, the government inspectors saw the beginnings of a stand of cotton when the fields were inspected in June. Consequently, the York County farmers did not qualify for low yield disaster payments, or they received payments lower than the payments received by Cherokee farmers.

The York County farmers contend that if the York County appraisals had been made at the same time as those in Cherokee County, the producers in York County would have also received very low appraisals. They conveyed this to the South Carolina Agricultural Stabilization Committee who requested relief because of misaction or untimely action to the Deputy Administrator of Programs, Agricultural Stabilization and Conservation Service in Washington, D. C. The Acting Deputy Administrator denied the request stating:

Appraisals are made on an individual farm basis when the producer indicates that he intends to devote the crop to

another use and will not carry it to harvest. When the disaster condition is a continuing event such as drought, appraisals are made on the basis of the crop condition on the day of the appraisal. Further, we have no alternative but to assume that conditions will be "normal" from day of appraisal to harvest time. Because individual determinations must be made farm by farm, that which occurs in one county may not be construed to be the same as in another county.[7]

The Secretary submits that the York County producers would have been entitled to a reappraisal of their cotton crop at the time of harvest if they filed an application for low yield disaster payments at that time. Instead, they decided to destroy their cotton crop in time to plant soybeans. Plaintiffs submit that to their knowledge other farmers who left their crops in place and tried to cultivate it showed a zero yield at harvest. These farmers were then paid crop insurance.

Plaintiffs posit that their class was the only group of cotton producers denied any relief. They submit that had their crops been inspected earlier, they would have received low yield disaster payments; had they tried to cultivate the crop, they would have received crop insurance. By destroying their cotton crop and trying to cultivate another crop, they received nothing.

Defendant argues that plaintiffs lack standing to adjudicate this action. Plaintiffs submit that this court has jurisdiction over this matter under 28 U.S.C. § 1331,[8] the Administrative Procedure Act[9] and 28 U.S.C. § 1337.[10]

---

7. This type of statement is typical of the type of action taken by faceless bureaucrats who try to cover up agency mistakes. It appears that the York County farmers are being made to bear the cross for the late appraisal of their land.

8. 28 U.S.C. 1331(a) states: Federal Question; amount in controversy; costs

(a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties

of the United States except that no such sum or value shall be required in any such action brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity.

9. 5 U.S.C. § 701, *et seq.*

10. 28 U.S.C. 1337 states: Commerce and antitrust regulations.

The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies.

The court will first address the issue of whether there is a justiciable case or controversy. This doctrine of standing arises from Article III, Section 2 of the Constitution of the United States that provides in part:

Section 2. The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority; . . . to Controversies to which the United States shall be a Party
. . . .

The Supreme Court has addressed the issue of standing on numerous occasions. In *Flast v. Cohen,* 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968) they stated that "the fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated. The 'gist of the question of standing' is whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). The doctrine of standing is composed of both constitutional and prudential restraints in the power of the federal courts to render decisions. In *Flast v. Cohen, supra,* the court stated that "in terms of Article III limitations on federal court jurisdiction, the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." 392 U.S., at 101, 88 S.Ct. at 1953.

■ The issue at hand is whether plaintiffs have standing to challenge nonconstitutional government action. This area of standing has been liberalized by recent Supreme Court decisions. The "old law" required that one must have suffered a "legal wrong" in order to contest the lawfulness of administrative action. That is to say, the right invaded must be a legal right. Under this old standard, something more than an injury in fact was required. *Tennessee Power Co. v. TVA,* 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1939); *Alabama Power Co. v. Ickes,* 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374 (1938); *Perkins v. Lukens Steel Co.,* 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940).

However, in this decade the Supreme Court has formulated a liberalized two-pronged test to determine whether a litigant possesses the requisite standing to adjudicate. The first question is whether plaintiffs allege that the challenged action has caused them *injury in fact,* economic or otherwise. *Data Processing Service v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). The court finds that the Secretary's denial of low yield disaster payments to plaintiffs is a sufficient injury in fact to satisfy this portion of the test. Therefore, plaintiffs have the personal stake and interest that impart the concrete adverseness required by Article III. See *Barlow, supra.*

The second question that must be resolved is referred to as the "zone of interest" test. The Supreme Court in *Data Processing Service v. Camp, supra,* defined it as follows:

The "legal interest" test goes to the merits. The question of standing is different. It concerns, apart from the "case" or "controversy" test, the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question. Thus the Administrative Procedure Act grants standing to a person "aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. 397 U.S., at 153, 90 S.Ct. at 830, 25 L.Ed.2d, at 188.

See also, *Barlow v. Collins, supra.* It is clear that plaintiffs are within the zone of interests to be protected by the statutes and regulations that deal with the Department of Agriculture. Title 7 U.S.C. § 1444(e)(2)

provides that "if the Secretary determines that the producers on a farm are prevented from planting, any portion of their cotton allotment to because of drought" that certain payments may ensue. Title 7 C.F.R. § 722.809(h) provides for disaster payments when the county committee determines that prevented planting or low yield occurred because of drought. Plaintiffs are cotton producers who allege low yield damage because of drought. As such, it is clear that they are within the zone of interests protected by the Act. Therefore, the court finds· that plaintiffs have standing.

The court must next deal with defendant's various motions to dismiss upon the grounds of lack of jurisdiction and the defense of sovereign immunity. Defendant submits that no jurisdiction exists under 28 U.S.C. § 1331 as it cannot be construed to constitute a waiver of sovereign immunity. This statute and Title 5 U.S.C. § 702 were amended in 1976 by P.L. 94–574 to diminish the defense of sovereign immunity. The House Report No. 94–1656 contained in 1976 U.S.Code Cong. and Admin.News, p. 6121. The Report recognized that the application of sovereign immunity is illogical and applied erratically. They stated that "the sovereign immunity doctrine diverts the court's attention from the basic issue concerning the availability or scope of judicial review. Sovereign immunity beclouds the real issue whether a particular governmental activity should be subject to judicial review, and, if so, what form of relief is appropriate." 1976 U.S.Code Cong. and Admin.News, at 6129. However, the amendment to 5 U.S.C. § 702 only abolishes the defense of sovereign immunity in equitable actions and not where plaintiff seeks monetary relief. The Report further states:

The first of the additional sentences provides that claims challenging official action or nonaction, and seeking relief other than money damages, should not be barred by sovereign immunity. The explicit exclusion of monetary relief makes it clear that sovereign immunity is abolished only in actions for specific relief (injunction, declaratory judgment, mandatory relief, etc.). Thus, limitations on the recovery of money damages contained in the Federal Tort Claims Act, the Tucker Act, or similar statutes are unaffected. The consent to suit is also limited to claims in courts of the United States; hence, the United States remains immune from suit in state courts.

Since the amendment is to be added to 5 U.S.C. section 702, it will be applicable only to functions falling within the definition of "agency" in 5 U.S.C. section 701. Section 701(b)(1) defines "agency" very broadly as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency" except for a list of exempt agencies or functions: Congress, Federal courts, governments of territories or of the District of Columbia, mediation boards, courts-martial and certain other military, wartime and emergency functions.

The proposed amendment will also not affect the operation of the rule that review is not available "to the extent that * * * statutes preclude review * * or * * * agency action is committed to agency discretion by law." 5 U.S.C. section 701(a). The case law concerning these two categories of review is thus untouched by the proposed amendment. The amendment *would* apply to bar the assertion of sovereign immunity and force the court to articulate the true rationale for a decision not to grant relief. 1976 U.S.Code Cong. and Admin.News., at 6131.

The amended Section 702 specifically provides that it does not affect other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground. These include, but are not limited to the following: (1) extraordinary relief should not be granted because of the hardship to the defendant or to the public ("balancing the equities") or because the plaintiff has an adequate remedy at law; (2) action committed to agency discretion; (3) express or implied preclusion of judicial review; (4) standing; (5) ripeness;

(6) failure to exhaust administrative remedies; and (7) an exclusive alternative remedy. Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 3655.

The Secretary correctly submits that review under 5 U.S.C. § 702 is limited by 5 U.S.C. § 701. That statute provides in part that judicial review is precluded where statutes preclude judicial review or agency action is committed to agency discretion by law. Defendant submits that the reviewability of appraisals conducted by the Secretary are final and conclusive. In support of its position, the Secretary urges 7 U.S.C. § 1385 precludes review. It provides, in part, as follows:

The facts constituting the basis for any payment under the Soil Conservation and Domestic Allotment Act, as amended, parity payment, payments under the cotton set-aside program, payments (including certificates) under the wheat and feed grain set-aside programs, payment under section 1339 of this title, loan, or price support operation, or the amount thereof, when officially determined in conformity with the applicable regulations prescribed by the Secretary or by the Commodity Credit Corporation, shall be final and conclusive and shall not be reviewable by any other officer or agency of the Government.

The Secretary urges that the language "shall not be reviewable by any other officer or agency of the Government" precludes review by this court.

■ Although this appears to be a plausible argument, a careful analysis of the statute indicates that the court does retain a right to review an administrative action. A "finality provision" does not preclude judicial review of the question whether the findings of fact were in conformity with the regulations. This is a question of law reviewable under the Administrative Procedure Act, 5 U.S.C. § 704. Therefore, the court can review legal questions. *Aycock-Lindsey Corp. v. United States*, 171 F.2d 518 (5th Cir. 1918); *Garvey v. Freeman*, 397 F.2d 600 (10th Cir. 1968); *Gross v. United States*, 505 F.2d 1271, 205 Ct.Cl. 605

(1974). The court has the authority to review the procedures employed in reaching the administrative determination. *Prosser v. Butz*, 389 F.Supp. 1002 (N.D.Iowa 1974). the court further possesses the right to adjudicate whether the agency officials involved had the requisite status to render a final official agency determination. See *Jones v. Hughes*, 400 F.2d 585 (8th Cir. 1968). The court further has the power to review whether agency decisions are arbitrary and capricious. *Gross v. United States, supra; Garvey v. Freeman, supra.* The court is cognizant of the fact that the burden rests on plaintiffs to allege and prove that the decisions were arbitrary and capricious. *Gross v. United States, supra, Aycock-Lindsey Corp. v. United States, supra; Crain v. United States*, 84 F.Supp. 876, 114 Ct.Cl. 94 (1949), *cert. denied*, 339 U.S. 911, 70 S.Ct. 566, 94 L.Ed. 1337.

■ It is apparent that the statute precludes the court's review of the facts and underlying the Secretary's decision. However, the court does possess the authority to review an agency decision that is arbitrary and capricious. Plaintiff in his complaint stated that "[t]he actions of the defendant agency in denying the claims of the plaintiffs were in error and as a result of the erroneous decision-making on the part of the defendant . . . are entitled to drought relief under the formula set forth in the statute." The court finds that this is a sufficient allegation to plead arbitrary and capricious action. As such, the court has the authority to review the Secretary's decision.

■ The court further possesses the authority to review agency decisions that do not comply with due process of law. However, there is no record of an administrative decision other than the limited information contained in defendant's Memorandum of Law. The only concrete indication of any agency action before the court is a part of a quote from someone with the title of Acting Deputy Administrator denying relief to plaintiffs. The court has no indication of how this decision was made, or whether there was any hearing or administrative

appeal therefrom. All the court has before it is an allegation that plaintiffs were denied relief. While the court does not feel that the Administrative Procedure Act is a grant of jurisdiction[11], the court will grant a hearing if an agency does not comply with its own regulations and procedure or does not have a fundamentally fair hearing that complies with due process at the administrative level. At present it is impossible for this court to determine whether the Secretary's action complied with its own regulations, administrative procedures, was arbitrary and capricious or a final agency action with the lack of a record before it. Therefore, it is the judgment of this court that this matter be remanded to the Secretary for a full administrative hearing on the merits within 60 days of this Order, with a record to be kept of the proceedings. If the Secretary chooses not to comply with this Order, the court will schedule a full hearing on the merits.

 Defendant's motions to dismiss for lack of jurisdiction are denied. It is unnecessary for the court to determine whether jurisdiction exists under 28 U.S.C. § 1331 or 28 U.S.C. § 1337 as the court has determined it has jurisdiction to review the administrative decision of the Secretary.[12] Defendant's motion to dismiss for failure to state a claim is denied as defendant did not address this issue except in relation to the questions of standing, jurisdiction and reviewability.

AND IT IS SO ORDERED.

11. The concept of whether the Administrative Procedure Act, 5 U.S.C. §§ 701–706 is an implied grant of subject matter jurisdiction to review agency action has been a disputed item among the various circuits for years. Commentators such as Wright and Miller in their treatise, *Federal Practice and Procedure*, and Davies in his treatise, *Administrative Law*, split over which viewpoint is the better one. However, the Supreme Court in *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977) resolved this inconsistency by holding that the Administrative Procedure Act is not to be interpreted as an implied grant of subject matter jurisdiction.

12. If a fair and impartial administrative proceeding is not held, this court reserves the right to have a full hearing on the merits as an administrative decision that does not comply with due process of law presents a federal question that arises under 28 U.S.C. 1331.